[No. A102820. First Dist., Div. One. Aug. 30, 2004.]

MIGUEL JARA, SR., Plaintiff and Appellant, v.
SUPREMA MEATS, INC., et al., Defendants and Appellants.

[Nos. A104666, A105119. First Dist., Div. One. Aug. 30, 2004.]

MIGUEL JARA, SR., Plaintiff and Respondent, v.
SUPREMA MEATS, INC., Defendant and Appellant.

**COUNSEL**

Thelen Reid & Priest, Kenneth L. Nissly and Christine E. Stephens for Plaintiff and Appellant and for Plaintiff and Respondent.

Keker & Van Nest and Steven A. Hirsch for Defendants and Appellants Miguel Jara, Jr., and Gonzalo Rodriguez.

Law Offices of Steven J. Hassing and Steven J. Hassing for Defendant and Appellant Suprema Meats, Inc.

OPINION

SWAGER, J.—Miguel Jara, Sr. (hereafter Jara, Sr., or plaintiff), a minority shareholder of Suprema Meats, Inc., a California corporation (hereafter Suprema), brought suit against the corporation and its two other shareholders, his son, Miguel Jara, Jr. (hereafter Jara, Jr.) and Gonzalo Rodriguez (hereafter Rodriguez). The judgment awarded Suprema damages to be paid by Jara, Jr., and Rodriguez but also ordered Suprema to comply with the disclosure requirements of Corporations Code section 1601 and to pay Jara, Sr., reasonable attorney fees in enforcing his rights of disclosure. Suprema, Jara, Jr., and Rodriguez appeal from the judgment. Jara, Sr., separately appeals from the portion of the judgment awarding damages only to the corporation and from intermediate orders denying his individual causes of action for damages. The appeal is consolidated with separate appeals from an order awarding attorney fees under Corporations Code section 1604 and an order enforcing judgment. We reverse the judgment and postjudgment orders.

## PROCEDURAL HISTORY

Jara, Sr., filed a complaint against Suprema, Jara, Jr., and Rodriguez on November 7, 2000, which was later twice amended.[1] The second amended complaint alleged four causes of action. The first cause of action alleges that Jara, Jr., and Rodriguez, as majority shareholders and officers of Suprema, breached an oral contract not to increase their salaries or bonuses unless all shareholders agreed on the amount of the increase. The second cause of action alleged that Jara, Jr., and Rodriguez, as majority shareholders, breached a fiduciary duty to the minority shareholder, Jara, Sr., by paying themselves excessive compensation and denying Jara, Sr., a fair share of the corporate profits. The third cause of action claimed that defendants refused the requests of Jara, Sr., under Corporations Code sections 1601 et seq., to inspect and copy corporate records. The last cause of action sought an accounting.

The matter came up for a court trial on January 16, 2003, before a temporary judge appointed by stipulation of the parties. On the day before trial, defendants filed a motion in limine to exclude all evidence seeking to establish that Suprema paid Jara, Jr., and Rodriguez excessive compensation. The motion contended that damages for excessive compensation could be recovered only by the corporation itself through a derivative action based on breach of fiduciary duty and that Jara, Sr., had failed to bring such an action. Deferring a ruling on the motion, the trial court received expert testimony of both parties concerning the reasonableness of the compensation paid to

---

[1] Jara, Jr., filed a cross-complaint against Jara, Sr., concerning a separate transaction, which is not at issue in this appeal.

Jara, Jr., and Rodriguez. Shortly after presentation of evidence, the court granted the motion in limine, thereby effectively denying Jara, Sr.'s claim to recover individual damages pursuant to his second cause of action for breach of fiduciary duty. Jara, Sr., moved to amend the complaint to state a derivative cause of action in conformance to proof, but the motion was denied.

The court trial, which spanned seven days of testimony and arguments, created an extensive record concerning the short history and remarkable success of Suprema and the conflictive relationship between Jara, Sr., and the other shareholders. The court issued a statement of tentative decision approximately two months after conclusion of the trial and a substantially identical final statement of decision on May 15, 2003. The statement of decision noted that the cause of action for breach of fiduciary duty had been dismissed by the court, and found that the cause of action for an accounting was "no longer relevant" in the absence of a derivative cause of action but granted relief on the breach of contract and corporate disclosure causes of action.

The trial court found that "an agreement was reached that no compensation in excess of $800 per week could be received by [Jara, Jr.] or [Rodriguez] at any time without the unanimous approval of all three shareholders." Jara, Jr., and Rodriquez breached this contract by paying Jara, Jr., compensation that exceeded the agreed $800-per-week salary in the amount of $1,392,643 and paying Rodriguez compensation that exceeded this amount by $873,792. Adding interest to these amounts, the court found contract damages to be $2,620,851, plus daily interest accruing until the judgment is paid in full. The court found, however, that the injury was "suffered by the corporation" rather than the plaintiff, Jara, Sr., because "the corporation [was] deprived of funds which would, except for the acts of Defendants, have remained with the corporation. In effect, Suprema was the third party beneficiary of the Jara-Rodriguez contract." Accordingly, the court awarded the damages solely to Suprema.

In the remaining cause of action, the court found that all defendants failed to comply with Corporations Code section 1601 by refusing to give Jara, Sr., monthly financial statements. The court therefore ordered Suprema to provide Jara, Sr., "access to its monthly financial statements upon written request for review and copying" and awarded Jara, Sr., "attorney fees and costs relative to enforcement of his rights under Section 1601 pursuant to Section 1604 of the Corporations Code."

Defendants, Suprema, Jara, Jr., and Rodriguez, filed a notice of appeal from the judgment entered on the statement of decision. Jara, Sr., separately appealed from the judgment and certain intermediate orders. The brief in

support of his cross-appeal raises issues with respect to the portion of the judgment awarding damages to Suprema for breach of contract and from the intermediate orders granting defendants' motion in limine and denying Jara, Sr.'s motion to amend the complaint to conform to proof. The appeal has been consolidated with separate appeals from the award of attorney fees under Corporations Code section 1604 and from an order compelling Suprema's enforcement of the judgment.

## STATEMENT OF FACTS

Jara, Sr., a native of Mexico, has lived in this country continuously since 1961, when he acquired legal immigration status. In 1973, he opened a taco restaurant in the Mission District of San Francisco and five years later opened a second restaurant in San Jose. The restaurants were successful and provided the financial resources for other investments in real estate. Jara, Jr., claims to have been raised by his grandparents since the age of four. His first work experience was as a butcher, but he moved to a series of short-term jobs before finding a job as a meat salesman for a wholesale meat distributor. In this position, he became friends with Rodriguez, another meat salesman. Together they formed plans to launch their own wholesale meat distribution business to serve Hispanic restaurants. Rodriguez was able to contribute $20,000 to the venture, but Jara, Jr., had no funds of his own. When they were rebuffed in an attempt to get a commercial loan, Jara, Jr., approached his father for financial backing sometime early in 1996.

Since the trial court found the testimony of Jara, Sr., to be credible, we will rely on his account of what ensued without attempting to weigh or evaluate the conflicting trial testimony. According to Jara, Sr., he agreed to obtain a $150,000 line of credit in return for a 20 percent stock interest in the new company. He actually succeeded in securing a larger line of credit for $250,000 from Bank of the West and made the full amount available to the business. As preparations proceeded for opening the business, Jara, Sr., made a series of other financial contributions: he helped negotiate leases on refrigerated trucks and paid first and last months' lease payments amounting to a total of $12,000, and he paid $3,000 to lease some forklifts and $2,000 in legal fees for the incorporation of the business. In addition, he cosigned a warehouse lease and claimed at trial to have made payments on the lease.[2] In recognition for this support, Jara, Jr., and Rodriguez decided to give Jara, Sr., another 10 percent ownership interest in the business.[3]

---

[2] The record contains no evidence of the initial lease, but a successor lease dated May 1997 for the same premises called for payments of $13,500.

[3] Jara, Sr., testified, "He [Jara, Jr.] said, you know, dad, I was talking to my partner Gonzalo and he suggested we give you an extra 10 percent because you're really going like crazy to get us going. That's how that other 10 percent came along."

Suprema was incorporated on June 7, 1996. Jara, Jr., and Rodriguez were each issued 35,000 shares of stock and Jara, Sr., was issued 30,000 shares. Jara, Jr., was president and treasurer; Rodriguez was vice-president and secretary; and Jara, Sr., was vice-president. All three shareholders were members of the board of directors.

Suprema opened for business on June 10, 1996. During the first months, Jara, Jr., often called his father for business advice. On one of these occasions near the "beginning of the company," Jara, Jr., called in the evening for advice on the salary that the corporation should pay him and Rodriguez. Jara, Sr., suggested that they begin by paying themselves no more than what they needed to live and asked what the son was making as a meat salesman. Jara, Jr., replied that he was making $800 per week. Jara, Sr., recalled that he advised, "You know, if you want to do that, you know, if you think that you work more or you earn more money than the $800, why don't you put it in the books and when there's some money, you pull the money out, you know." Jara, Sr., added that his son should call Rodriguez to see if this approach would be "all right with" him.

According to Jara, Sr., his son called back later in the evening to say that he had talked to Rodriguez about the advice Jara, Sr., had given. As Jara, Sr., recalled the conversation, his son said: "I talked to Gonzalo [Rodriguez] and he said it is okay with him. Whenever we're going to pull the money out, *we will make sure all of us agreed how much money that's going to be*. And I [Jara, Sr.] said it's okay." [Italics added.]

Jara, Sr., testified that he understood from this conversation that all three shareholders had to agree on a salary increase for Jara, Jr., and Rodriquez. He explained, "[W]henever we're going to take some more money out, we will get together and we will agree at how much money they will have. The $800 was already agreed at." He recounted that his son said "whenever we were going to do anything about salaries, we all have to agree" and he "agreed to that."

At Jara Jr.'s request, Bruce Maddox, Suprema's accountant, drafted a footnote to the annual financial statement to memorialize this understanding. The footnote was edited by Jara, Jr., and included in the 1998 and 1999 financial statements in the following form: "The Board of Directors has agreed in princip[le] to compensate the officers who maintain customer accounts in accord with normal industry practice. . . . Subject to the restriction in the following paragraph, Management has elected not to pay such compensation currently in order to conserve working capital and provide for growth. [¶] The compensation to be paid is undetermined as of the date of this report, and, before payment may be made, it must be approved by all current shareholder-directors."

The business experienced rapid growth. The financial statement for the year ended March 31, 1998, showed revenues of approximately $12 million and a gross margin of $1,010,000 and net income of $241,482. After switching to a September 30th calendar year, the financial statement for the year ended September 30, 1999, reported revenue of $22,392,869 and a gross margin of $1,995,402 and net income of $959,600. Concurrently, Suprema began to secure credit terms from major meat suppliers. The effect was to relieve it of dependence on the line of credit with Bank of the West, which it initially used to offer suppliers letters of credit guaranteeing payment of their orders.

Despite burgeoning revenues and profits, Suprema continued to pay Jara, Jr., and Rodriguez, annual salaries of $43,367, or $800 per week, throughout the first three and a half years of operation. At the end of 1999, Jara, Jr., and Rodriguez decided to call a meeting of the board to increase their compensation. The accountant, Bruce Maddox, testified that the purpose of the meeting was "to carry out the second paragraph [of note 10 to the financial statements] that said all shareholders must agree." The meeting was attended by the three board members and Maddox, who took written notes. Though testimony of what occurred varies significantly, we will review only the testimony Jara, Sr., which the trial court found most credible.

According to Jara, Sr., his son called him to tell him of a meeting on December 31, 1999, and said he and Rodriguez each wanted 25 percent of the "profits." He commented that "it seems to me like you're trying to milk the cow." Jara, Sr., recalled that the board took two votes. He first agreed to the proposal of 25 percent of "gross profits" but he was not happy with this outcome. Jara, Jr., insisted that they come to a real agreement and Rodriguez proposed 20 percent. They voted on this proposal and this time he voted no. Rodriguez announced that it was decided by a two-to-one vote. Jara, Jr., wanted to continue the discussion and suggested that they hire an expert to determine what the compensation would be. Jara, Sr., recalled that he agreed to this, but the accountant, Maddox, testified that the parties could not come to an agreement on a way of hiring a mutually acceptable expert.

Both Jara, Sr., and Maddox recalled that no agreement was reached at the meeting. Jara, Sr., testified that a few days later Maddox told him that Jara, Jr., did not want to retain a compensation expert. Maddox, who was the accountant for Jara, Sr., ceased serving as Suprema's accountant shortly after the meeting because he did not think he could work for both clients in view of the emerging conflict.

In the second week of January 2000, Jara, Sr., retained an attorney, Kenneth Nissly, to assist him in negotiating a shareholder agreement. We will

later examine closely the correspondence between Nissly and Suprema in connection with the corporate disclosure issues. On April 18, 2000, Nissly wrote a letter to Jara, Jr., stating that the financial analysis of a retained accountant, Roberto Maragoni, indicated that $135,000 was "likely to be a good number for executive compensation." Upon receiving the letter, Jara, Jr., and Rodriguez decided to increase their weekly draw from $800 to $2,000 per week. About this time, Suprema stopped making meat deliveries to Jara, Sr.'s restaurants.

The record indicates that Jara, Jr., and Rodriguez met on July 5, 2000, to handle corporate business. Rodriguez thought that they conducted a meeting of shareholders and board of directors at the same time. Jara, Sr., was not notified of the meeting and did not attend. The two directors in attendance, Jara, Jr., and Rodriguez, voted themselves bonuses of $220,000 and $180,000, respectively, payable between July 15 and December 31, 2000.

The record reveals that Jara, Sr., attended one more meeting of shareholders and board of directors on July 12, 2002. At that time, he was formally removed from the board and Suprema established a two-person board of directors, but he remained a vice-president of the company.

In the two and one-half-year period from July 2000 through December 2002, Jara, Jr., and Rodriguez received a series of further bonuses in addition to the enhanced weekly draw. They agreed to a 55/45 split of officer compensation with Jara, Jr., receiving the larger share. Jara, Sr., calculates that Jara, Jr., received total compensation of $400,360 in the fiscal year ending September 30, 2000, and compensation of $414,700 and $788,602 for the succeeding years ending on September 30, 2001, and 2002. Rodriguez received total compensation of $327,567, $339,300, and $403,231 for these fiscal years. In July 2002, Rodriguez agreed to sell his stock interest to Jara, Jr., but the sales agreement provided for continued salary payments to the end of the year. Defendants retained a compensation expert in preparation for trial, who advised Jara, Jr., on the amount of the bonuses to be paid at the end of 2002.

Rodriguez acknowledged that he and Jara, Jr., wanted to take money out of the company through their compensation, but they repeatedly loaned all or part of the bonus payments back to the company during this period. The corporate accountant, Barry Goldstein, explained that they wanted to maintain an operating reserve of $750,000 and the company was in fact never short of cash. At the time of trial, the corporation had paid off all the loans made by Jara, Jr., and Rodriguez for the purpose of meeting current cash needs.

The size of the executive compensation reflected the continued growth of the company. At the fiscal year ended September 30, 2000, Suprema had

revenues of $32,370,136 and gross margin of $2,258,124; in the 2001 fiscal year, it reported revenues of $41,274,009 and gross margin of $3,454,141; and in the 2002 fiscal year, it had revenues of $44,349,977 and gross margin of $4,944,482.

Jara, Sr., testified that he was "happy" with the way his son and Rodriguez ran the company, but he objected to the payment of executive compensation without his consent or approval. In July 2002, Suprema for the first time paid him a dividend of $129,000.

At the trial, the parties presented conflicting expert testimony on the reasonableness of executive compensation paid to Jara, Jr., and Rodriguez. In the absence of any finding on this issue, we have no need to review this testimony in detail. It suffices to say that the expert witness for Jara, Sr., relied on comparable market data, whereas the expert witnesses for Suprema and the individual defendants, Jara, Jr., and Rodriguez, placed greater weight on executive performance, corporate profitability and return on investment.

## DISCUSSION

### A. *Consideration*

#### 1. *Legal Principles*

In their first and dispositive assignment of error, Jara, Jr., and Rodriguez, argue that the trial court erred in finding an enforceable agreement among shareholders to require the approval of all shareholders for an increase in officer compensation. They argue that Jara, Jr.'s promise to this effect in the evening telephone conversation with his father, which was memorialized in note 10 of the 1998 and 1999 financial statements, was a gratuitous promise lacking in consideration.

This assignment of error calls on us to review the doctrine of consideration in California contract law. We begin by noting that, in *Bard v. Kent* (1942) 19 Cal.2d 449 [122 P.2d 8], the Supreme Court authoritatively adopted the concept of consideration as a bargained-for exchange as formulated in the Restatement of Contracts, section 75, which is now expressed with insignificant changes in language in Restatement Second of Contracts, section 71. This understanding of the doctrine of consideration was reaffirmed in *Simmons v. Cal. Institute of Technology* (1949) 34 Cal.2d 264, 272 [209 P.2d 581], and continues to guide California courts. (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 10 [96 Cal.Rptr.2d 179, 999 P.2d 71]; *US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 128–129 [111 Cal.Rptr.2d 689];

*Flojo Internat., Inc. v. Lassleben* (1992) 4 Cal.App.4th 713, 719 [6 Cal.Rptr.2d 99]; *Enslow v. von Guenthner* (1961) 193 Cal.App.2d 318, 322 [14 Cal.Rptr. 231].)

Section 71 of Restatement Second of Contracts states in pertinent part: "(1) To constitute consideration, a performance or a return promise must be bargained for. [¶] (2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." Comment b observes: "In the typical bargain, the consideration and the promise bear a reciprocal relation of motive or inducement: the consideration induces the making of the promise and the promise induces the furnishing of the consideration."

Farnsworth explains that the courts began to require that consideration be bargained for in the late 19th century. The effect of this development of the doctrine was to direct legal analysis to "the process by which the parties had arrived at that exchange—was it the product of 'bargain?' " (1 Farnsworth on Contracts (3d ed. 2004) § 2.2, p. 79.) In California, the concept is consistent with the early statutory definition of "good consideration" in Civil Code section 1605: "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, *as an inducement to the promisor*, is a good consideration for a promise." (Italics added.) The phrase "as an inducement to the promisor" reflects the requirement, more clearly enunciated in the Restatement, that the consideration be a bargained-for exchange.

In view of the requirement of a bargained-for exchange, California courts have repeatedly refused to enforce gratuitous promises, even if reduced to writing in the form of an agreement. (*Simmons v. Cal. Institute of Technology, supra,* 34 Cal.2d 264, 269, 272–273 [written agreement to secure approval of research institute for licensing of invention]; *Simonian v. Patterson* (1994) 27 Cal.App.4th 773, 778, 780 [32 Cal.Rptr.2d 722], [father's promise to persuade his daughter to return property to an ex-boyfriend]; *Sparks v. Lauritzen* (1967) 248 Cal.App.2d 269, 273 [56 Cal.Rptr. 370], [decedent's promise to leave estate to appellants who gave him food, shelter, and care]; *Enslow v. von Guenthner, supra,* 193 Cal.App.2d 318 [14 Cal.Rptr. 231] [written agreement revising contractor's obligation after performance was rendered and payment due]; *Dow v. River Farms Co.* (1952) 110 Cal.App.2d 403, 410–411 [243 P.2d 95] [corporate resolution to pay officer $50,000 for past services in the absence of any expectation of payment when services were rendered].)

The decision in *Passante v. McWilliam* (1997) 53 Cal.App.4th 1240 [62 Cal.Rptr.2d 298] is based on facts closely parallel to the present case. Passante, an attorney for a start-up company, arranged a $100,000 loan that allowed for a deposit required by a contract vital to the company's success. The money was wired to an account controlled by a board member before the loan was presented to the board for its approval. In gratitude, the board promised to give Passante a 3 percent stock interest in the company. When the company later reneged on this promise, Passante sued for breach of contract and secured a $33 million jury verdict, but the trial court entered a judgment for the defendants notwithstanding the verdict.

Affirming the judgment, the court held: "As a matter of law, any claim by Passante for breach of contract necessarily founders on the rule that consideration must result from a bargain." (*Passante v. McWilliam, supra,* 53 Cal.App.4th 1240, 1247.) The court found that "the stock had not been bargained for in exchange for arranging the loan; Passante had already arranged the loan (even though the loan had not been formally accepted by the board) before the idea of giving him stock was ever brought up. There is no evidence that Passante had any expectation that he be given stock in return for arranging the $100,000 loan. . . . '[I]f there was no expectation of payment by either party when the services were rendered, the promise is a mere promise to make a gift and not enforceable.' [Citation.]" (*Id.* at pp. 1248–1249.)

### 2. *Standard of Review*

In applying these principles to the facts, we view the record in the light most favorable to the judgment. It is a familiar principle that " 'every intendment and presumption not contradicted by or inconsistent with the record on appeal must be indulged in favor of the orders and judgments of superior courts.' [Citation.]" (*Walling v. Kimball* (1941) 17 Cal.2d 364, 373 [110 P.2d 58].)

The relevant evidence on the issue of consideration is found in the testimony of the parties themselves, Jara, Sr., Jara, Jr., and Rodriguez. In this appeal, Jara, Jr., and Rodriguez, seek to minimize issues of fact by predicating their argument solely on the testimony of Jara, Sr., whom the trial court found most credible. We likewise will confine our review to the testimony of Jara, Sr., while indulging in every inference favorable to the judgment in construing his testimony.

### 3. *Absence of Consideration*

In our view, the testimony of Jara, Sr., can only be construed as revealing that his son's promise not to increase compensation without unanimous

shareholder agreement was unsolicited. The testimony makes clear that Jara, Jr., first raised the idea of unanimous shareholder agreement on executive compensation, without any prompting or solicitation, in an evening telephone conversation. According to Jara, Sr.'s account of this conversation, his son called him for advice on what he and Rodriguez should pay themselves and he responded by suggesting that they pay themselves what they received at their past job, while clearly indicating that they were free to adopt or reject his advice. (*"If you want to do that, . . . if you think that you work more or you earn more money than the $800, why don't you* [start with the low salary and take more when appropriate].") When Jara, Jr., called back after consulting Rodriguez, he said they accepted the advice and then volunteered an entirely unsolicited promise "we will make sure all of us agree[] how much money that's going to be." We find nothing in Jara, Sr.'s testimony suggesting that the promise arose from any earlier conversation about shareholder approval or that the promise responded to any suggestion, objection or inducement that Jara, Sr., may have made.

Again, Jara, Sr.'s account of the conversation clearly indicates that his son's promise was gratuitous in the sense of being offered without expectation of any exchange promise or performance. Nothing in the record suggests that Jara, Jr., sought to elicit a similar promise from Jara, Sr., or that he hoped to induce some other kind of performance in exchange for his promise to secure unanimous approval. Jara, Sr., had already given the new company the full extent of his financial support. So far as revealed in the record he did not make any further contribution to the business other than rendering occasional advice, and Jara, Jr., and Rodriguez did not seek any further contribution.

■ It does not matter whether Jara, Jr.'s promise arose from a feeling of gratitude toward his father or from fear that the father would retract his support for the line of credit the company needed. Again, it is irrelevant that Jara, Jr., may have tried to keep faith with the promise by incorporating it in footnote 10 and by calling the meeting on December 31, 1999, to seek his father's agreement. The existence of consideration does not depend on Jara, Jr.'s subjective state of mind but on whether the objective manifestations of agreement by the parties constituted a bargain. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].) It is relevant only that Jara, Jr.'s promise was unsolicited and gratuitous; it was neither induced by promises or conduct of his father nor given to induce a return promise or performance.

In this appeal, Jara, Sr., now contends that we adopt the trial court's analysis that three shareholders exchanged promises to refrain from voting in favor of an increase in officer compensation without the approval of the other two shareholders. The effect of this agreement, he argues, would be a valid

bilateral contract, analogous to a voting trust, to protect each shareholder from a combination of the other two in setting officer compensation. (See *Bleecher v. Conte* (1981) 29 Cal.3d 345, 350 [213 Cal.Rptr. 852, 698 P.2d 1154] [bilateral contract]; *Garratt v. Baker* (1936) 5 Cal.2d 745 [56 P.2d 225] [bilateral contract]; *Ramos v. Estrada* (1992) 8 Cal.App.4th 1070, 1077 [10 Cal.Rptr.2d 833] [voting trust].)

We consider, however, that this analysis has an entirely theoretical character. The record contains nothing suggesting that Jara, Jr., sought a return promise on the part of his father or contemplated anything resembling a voting trust. Jara, Jr., did not condition his promise on receiving a similar commitment from the father or manifest any expectation of securing an exchange promise. It follows that, if Jara. Sr., had responded by promising to abide by a shareholder agreement resembling a voting trust, the promise would not have constituted bargained-for consideration because it would not have been given in response to any inducement of Jara, Jr. But Jara, Sr.'s testimony does not indicate that he in fact tried to seize on this opportunity to bind his son to the kind of bilateral contract he now describes. Instead, the noncommittal response that he recalls giving to his son ("And I said it's okay") evidenced no more than acquiescence in his son's apparent goodwill and cannot be reasonably construed as a bid to enter into a bilateral contract regarding the future exercise of voting rights.

Our conclusion calls for reversal of the judgment awarding damages for breach of contract as well as reversal of the postjudgment order filed December 4, 2003, compelling performance of this judgment, which is the subject of a separate appeal consolidated herewith. (A105119.)

B. *Derivative Action*

In a separate appeal, Jara, Sr., argues that the trial court erred in dismissing the second cause of action for breach of fiduciary duty on the ground that the claim could only be asserted in a derivative action. All parties argue that the unusual procedural route that the court took in dismissing the cause of action, i.e., granting of a motion in limine after presentation of evidence, calls for an exceptional standard of review. We consider, however, that the order granting the motion in limine to an entire category of pertinent evidence was tantamount to a dismissal of the second cause of action and is to be reviewed under the same standard as any other judgment of dismissal. (Cf. *Mechanical Contractors Assn. v. Greater Bay Area Assn.* (1998) 66 Cal.App.4th 672, 677 [78 Cal.Rptr.2d 225].)

The parties do not question the basic principle of the fiduciary duty owed by majority shareholders to minority shareholders. As stated in *Jones v. H. F.*

*Ahmanson & Co.* (1969) 1 Cal.3d 93, 108 [81 Cal.Rptr. 592, 460 P.2d 464], California courts "have often recognized that majority shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner. Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority."

██ We have no occasion to review the application of this principle to the facts of the case since the trial court made no findings on the issue of breach of fiduciary duty. The trial court's ruling was predicated instead on a procedural bar firmly rooted in a long line of precedent: an injury to the corporation cannot be maintained in an action brought by an individual shareholder on his own behalf but must be asserted in a derivative action in which the shareholder is "a mere nominal plaintiff, the corporation is the real party in interest, and any judgment recovered inures to its benefit." (*Thomson v. Mortgage Investment Co.* (1929) 99 Cal.App. 205, 212 [278 P. 468]; *Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525, 530 [170 P.2d 898]; *Anderson v. Derrick* (1934) 220 Cal. 770, 773 [32 P.2d 1078].) Looking only to the pleadings, the court found that the gravamen of the second cause of action for breach of fiduciary duty was an injury to the corporation for which a derivative action was the only permissible remedy. Since Jara, Sr., sought individual recovery of damages, the cause of action was subject to dismissal.

*Jones v. H. F. Ahmanson & Co., supra,* 1 Cal.3d 93 offers an authoritative analysis for distinguishing claims that must be asserted in a derivative action and those that may be asserted in an individual action. The *Jones* plaintiff owned 25 shares of capital stock in United Savings and Loan Association (Association). As a means of developing a market for Association shares, a group of majority shareholders incorporated a holding company, United Financial Corporation (United Financial), and exchanged their shares in the Association for those of United Financial. After the exchange, United Financial held 85 percent of the outstanding Association stock. The holding company then created a market for its stock through certain public offerings of stock. Then, it offered to purchase or exchange Association stock on terms that did not offer a value comparable to that of an equivalent holding in the holding company stock. It justified the low valuation of Association shares on the ground that they lacked the marketability of the holding company stock.

Plaintiff filed an individual action against United Financial and several majority stockholders individually, alleging that "the value of her stock [had] been diminished" by their actions. (*Jones v. H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 107.) The trial court sustained defendants' demurrer to the

complaint on the ground that the cause of action, if valid, was derivative in nature and could not be filed in a stockholder's individual suit. On appeal, the court first reviewed the concept of a derivative suit: "A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act. Thus, 'the action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' [Citations.]" (*Id.* at pp. 106–107.) In contrast, a stockholder's individual suit is " 'a suit to enforce a right against the corporation which the stockholder possesses as an individual.' [Citation.]" (*Id.* at p. 107.)

Applying this distinction to the facts, the court concluded "[i]t is clear from the stipulated facts and plaintiff's allegations that she does not seek to recover on behalf of the corporation for injury done to the corporation by defendants. Although she does allege that the value of her stock has been diminished by defendants' actions, she does not contend that the diminished value reflects an injury to the corporation and resultant depreciation in the value of the stock. Thus the gravamen of her cause of action is injury to herself and the other minority stockholders." (*Jones v. H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 107.) The court therefore allowed the plaintiff to seek damages based on the appraised value of her shares. (*Id.* at p. 118.)

*Jones* calls for closer scrutiny of earlier Court of Appeal decisions denying individual plaintiffs standing to sue. It expressly disapproved *Shaw v. Empire Sav. & Loan Assn.* (1960) 186 Cal.App.2d 401 [9 Cal.Rptr. 204], which held that a minority shareholder "could not maintain an individual action unless he could demonstrate the injury to him was somehow different from that suffered by other *minority* shareholders." (*Jones v. H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 107, 108.) And the holding in *Jones,* which allowed a plaintiff to sue for diminution of the value of her shares, is difficult to reconcile with the language of certain earlier decisions. (E.g., *Shenberg v. DeGarmo* (1943) 61 Cal.App.2d 326, 330 [143 P.2d 74], ["An individual stockholder may not maintain an action in his own right against the directors for destruction of or diminution in the value of the stock."].) But to the extent that it expanded somewhat the right to bring individual shareholder actions, *Jones* leaves intact the authority of earlier precedents allowing individual suits.

Following *Jones,* several courts have held that a derivative suit is the required means of asserting injury to the corporation resulting from mismanagement of corporate business. In *Avikian v. WTC Financial Corp.* (2002) 98 Cal.App.4th 1108, 1115 [120 Cal.Rptr.2d 243], the plaintiffs' "core claim"

was that the defendants mismanaged the corporation and entered into "self-serving deals" to sell its assets to third parties. The court held that these allegations amounted to a claim of injury to the corporation that could be recovered only in a derivative suit. In *Nelson v. Anderson* (1999) 72 Cal.App.4th 111 [84 Cal.Rptr.2d 753], a corporation engaged in a marketing venture had only two shareholders. Nevertheless, the court held that the minority shareholder had no standing to sue the majority shareholder for mismanagement of the corporation; the corporation itself had to bring the action through a derivative action. Again, in *Pareto v. F.D.I.C.* (9th Cir. 1998) 139 F.3d 696, the court held that the plaintiffs lacked standing to assert a claim that the directors of a bank breached their duty of care in arranging the liquidation and merger of the bank with another financial institution because the claim was "clearly derivative." (*Id.* at p. 700.)

Other post-*Jones* decisions, however, uphold the individual standing of a minority shareholder to bring suit against majority shareholders alleging a breach of a fiduciary duty that deprives the minority shareholder of a proportionate share of the corporation's value. In *Smith v. Tele-Communication, Inc.* (1982) 134 Cal.App.3d 338 [184 Cal.Rptr. 571], a parent corporation filed a consolidated tax return with the subsidiary while it engaged in liquidating the subsidiary. The filing had the effect of appropriating tax benefits to the parent corporation and reducing the distribution to the single minority shareholder in the subsidiary. The court held that the gravamen of the complaint was injury to the plaintiff as the only minority shareholder arising from an alleged breach of fiduciary duty by the majority shareholder. The allegations "raised a question as to whether the allocation [of tax savings] was inherently fair and equitable" to the plaintiff. (*Id.* at p. 345.)

Similarly, in *Crain v. Electronic Memories & Magnetics Corp.* (1975) 50 Cal.App.3d 509 [123 Cal.Rptr. 419], the majority shareholder of a computer company exercised its control over the company to sell the entire business to a third party for cash and to loan the cash back to itself in return for an unsecured promissory note payable to the computer company. The minority shareholders sued the majority shareholder, alleging that the effect of the transaction was to leave the computer company as a shell corporation with an unsecured note as its principal asset. The court held that the complaint alleged a breach of fiduciary duty that entitled the plaintiffs to individual relief, not solely derivative relief, against the majority shareholder. (*Id.* at p. 524.)

We see some tension between *Smith* and *Crain* and two opinions involving the transfer of corporate assets to a second corporation controlled by majority shareholders. The first, *PacLink Communications Internat., Inc. v. Superior*

*Court* (2001) 90 Cal.App.4th 958, 966 [109 Cal.Rptr.2d 436], itself distinguishes *Crain* and thereby provides a reasoned basis for harmonizing the decisions. The *PacLink* plaintiffs alleged that the defendants transferred the assets of the corporation to a second and a third corporation, in which the plaintiffs had no involvement, without payment of any consideration. In a mandate proceeding, the court sustained a demurrer to causes of action against the transferee corporations alleging fraudulent transfer, conspiracy, and constructive trust. Distinguishing *Crain,* the court observed that the writ proceedings did not concern a personal cause of action by the minority shareholders against majority shareholders for breach of fiduciary duty.

A second opinion involving a transfer of corporate assets rests on authority that *Jones* rejected six years earlier. In *Rankin v. Frebank Co.* (1975) 47 Cal.App.3d 75, 80 [121 Cal.Rptr. 348], the majority shareholders transferred "the manufacturing aspects of the business then being conducted by Frebank" to a newly formed corporation in which the minority shareholders had no interest. The court held that the minority shareholders could not recover individually for the diversion of corporate assets through this device because the gravamen of their case was injury to the corporation. The decision, however, represents questionable authority because it relied on *Shaw v. Empire Sav. & Loan Assn., supra,* 186 Cal.App.2d 401, which was expressly disapproved in *Jones* on a closely related point, and cites language in *Shenberg v. DeGarmo, supra,* 61 Cal.App.2d 326, that is inconsistent with *Jones* to allow individual recovery for diminution of stock value. (*Rankin v. Frebank Co., supra,* at p. 95.)[4]

Finally, we note that pre-*Jones* precedents include two cases that upheld individual causes of action on facts similar to the present case. *De Martini v. Scavenger's Protec. Assn.* (1935) 3 Cal.App.2d 691 [40 P.2d 317], supports Jara, Sr.'s claim that payment of excessive salaries to working shareholders may be tantamount to a discriminatory payment of dividends. The Scavenger's Protective Association was a corporation largely but not entirely owned by working employees. Beginning in 1929, it began a practice of making monthly distributions, described as wages, only to working shareholders. The four plaintiffs, who were stockholders not employed by the company, secured

---

[4] *Rankin* also inaccurately distinguishes *Jones* by mischaracterizing it as resting on a "dubious stipulation" of the plaintiff: "The individual suit is said to lie only when there is no injury to the corporation. [Citation.] In *Ahmanson* [here referred to as *Jones*], the plaintiff avoided this problem by the dubious stipulation that the corporation had not been injured. [Citation.] This procedure, although insuring an equitable damage award, runs the risk of damaging the interests of creditors, and compels the parties to stipulate to fiction." (*Rankin v. Frebank Co., supra,* 47 Cal.App.3d 75, 96.) This analysis represents a clear misreading of *Jones.* There was no such stipulation. Instead, *Jones* concluded as a matter of law from a review of "the stipulated facts and plaintiff's allegations" that the suit did not represent a claim of injury to the corporation. (*Jones v. H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 107.)

a judgment against the corporation in the amount of these distributions. Affirming the judgment, the court held that the corporation could not deprive shareholders of their share of the profits in the business by denominating distributions as wages. *De Martini* cited a Washington opinion holding that a corporation " 'cannot, by paying excessive or extravagant wages to the working stockholders, deprive the appellant of her share of the profits of the business.' " (*Id.* at p. 698.)

*Low v. Wheeler* (1962) 207 Cal.App.2d 477 [24 Cal.Rptr. 538], affirmed a judgment in favor of a minority shareholder, who claimed to be unfairly treated preceding the company's sale to a third party. The evidence at trial showed that the majority shareholders reduced the value of the minority shareholder's shares by refusing to pay dividends, excluding him from representation on the board, and negotiating a sale of the company that gave majority shareholders a better price per share than minority shareholders. The court held: "the wrong alleged by plaintiff and found by the jury was one to plaintiff as an individual, because the corporation was about to be dissolved at the time of the sale of all of the corporate stock, and was dissolved promptly by the purchaser. . . . Where a stockholder is directly and individually injured, he may sue as an individual." (*Id.* at pp. 482–483.)

Defendants cite three cases for the proposition that the payment of excessive compensation by corporate officers may be challenged only through a derivative cause of action. *Shenberg v. DeGarmo, supra,* 61 Cal.App.2d 326, offers a degree of support for this position, though excessive compensation was only one of a number of related issues. The plaintiff, a minority shareholder, alleged that a group of dominant majority shareholders engaged in a course of wrongdoing, including the payment of an excessive salary to one of their number, which diminished the value of his shares. The court held that the plaintiff's only remedy was through a derivative suit. A second case, *Thompson v. Price* (1967) 251 Cal.App.2d 182 [59 Cal.Rptr. 174], does not address the procedural distinction between a derivative and individual action, though it allowed a corporation to recover funds that were in part withdrawn as excessive salaries. The third case, *Rankin v. Frebank Co., supra,* 47 Cal.App.3d 75, represents questionable authority, as noted above. (*Ante,* at p. 1256.)

This review of the case law serves to demonstrate that we may most profitably look to *Jones* itself in applying the distinction between individual and derivative actions. *Jones* not only represents controlling authority but also displays a clarity and relevance to the present case that we have not found elsewhere in the case law. Like the federal court in *Pareto,* we read *Jones* as allowing a minority shareholder to bring a personal action alleging "a majority stockholders' breach of a fiduciary duty to minority stockholders,

which resulted in the majority stockholders retaining a disproportionate share of the corporation's ongoing value." (*Pareto v. F.D.I.C., supra,* 139 F.3d 696, 699–700.) Though inconsistent with *Rankin,* this interpretation of *Jones* is supported by *De Martini, Low, Smith,* and *Crain.* (Cf. *Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 425–429 [8 Cal.Rptr.3d 31].) Other opinions dealing with mismanagement (e.g., *Avikian* and *Nelson*) or fraud (e.g., *Sutter* and *PacLink*) have no direct relevance to the present case.

The case at bar comes within the scope of allowable individual actions under this interpretation of *Jones.* The gravamen of Jara, Sr.'s complaint is that he was deprived of a fair share of the corporation's profits as a result of defendants' generous payment of executive compensation to themselves. As Rodriguez conceded on cross-examination, the corporation paid bonuses to defendants with the objective of reducing the amount of profit in the corporation that had to be shared with Jara, Sr. These payments gave rise to an injury to Jara, Sr., as an individual.

We recognize that the present case represents a closer case than *Jones* with respect to possible injury to the corporation itself. In *Jones* the manipulation of stock values by the defendants had no effect whatever on the underlying business; here, the alleged payment of excessive compensation did have the potential of damaging the business. But the record shows that the company in fact experienced extraordinary growth while preserving operating reserves and access to credit. Indeed, Jara, Sr., testified that he was happy with the way Jara, Jr., and Rodriguez ran the business. He does not claim that the company would have experienced still greater prosperity and growth if the salaries had been smaller but rather maintains that the payment of generous executive compensation was a device to distribute a disproportionate share of the profits to the two officer shareholders during a period of business success.

We find further support for this conclusion in the absence of any policy considerations favoring derivative actions in the procedural context of the present case. As explained in a leading treatise, the traditional justification for requiring a derivative action is that "it is designed to prevent a multiplicity of actions by each individual shareholder and a preference of some more diligent shareholders over others, and to protect the creditors who have first call on the corporate assets . . . ." (2 Marsh's Cal. Corporation Law (4th ed. 2004 Supp.) Shareholders' Rights, § 15.11[A], p. 15-61; see *Sutter v. General Petroleum Corp., supra,* 28 Cal.2d 525, 530 ["multitudinous litigation"]; *Anderson v. Derrick, supra,* 220 Cal. 770, 773 ["every stockholder must be accorded the same right"]; *Shenberg v. DeGarmo, supra,* 61 Cal.App.2d 326,

330 ["the rights of creditors of the corporation, which are superior to those of the shareholders, would not be protected if individual shareholders were permitted to sue in their own right"].)

The rule requiring a derivative action may also be justified as serving the policies of Corporations Code section 800 (formerly section 834), which imposed a series of procedural prerequisites for bringing a derivative action when enacted in 1949. Subdivisions (b)(1) and (c) have the purpose of shielding the corporation from meritless lawsuits by requiring the plaintiffs to have contemporaneous stockownership and by giving the defendants the right to move the court for an order requiring a bond. (*Gaillard v. Natomas Co.* (1985) 173 Cal.App.3d 410, 415 [219 Cal.Rptr. 74], [contemporaneous ownership].) Subdivision (b)(2), which requires the plaintiffs to submit a demand to the board of directors before filing suit, reflects the legislative intent of encouraging the "intracorporate resolution of disputes" and protecting "managerial freedom." (*Shields v. Singleton* (1993) 15 Cal.App.4th 1611, 1619 [19 Cal.Rptr.2d 459].)

These policies find little or no application in the present case. The objective of preventing a multiplicity of lawsuits and assuring equal treatment for all aggrieved shareholders does not arise at all when there is only one minority shareholder. The objective of encouraging intracorporate resolution of disputes and protecting managerial freedom is entirely meaningless where the defendants constitute the entire complement of the board of directors and all the corporate officers. And the policy of preserving corporate assets for the benefit of creditors has, at best, a very weak application where the corporation remains a viable business.

In the absence of policy considerations favoring a derivative action, we have no reason to look beyond the strict application of precedent in determining whether a derivative action must be brought to assert a shareholder grievance. We see nothing in *Jones* that bars Jara, Sr., from bringing an individual action claiming damages for the breach of fiduciary duty of majority shareholders as alleged in the second cause of action.

Defendants object that "any award of damages to [Jara, Sr.] would have rested entirely on the entirely speculative assumption that Suprema would have distributed that amount to [Jara, Sr.] as dividends or otherwise, had it not paid [Jara, Jr.] and [Rodriguez] excessive compensation." As oblique support of this argument, they point to the trial court's finding that "there is no basis for the · Court to find with reasonable certainty that additional allocations . . . would have been paid" if the company was an S corporation or C corporation. But following *De Martini*, we interpret the complaint as seeking a share of disguised dividends paid to Jara, Jr., and Rodriguez in the

form of excessive compensation.[5] It is possible to calculate the amount of such disguised dividends and to award Jara, Sr., his fair share after taking into account the $129,000 dividend that he did receive.

We conclude that the trial court erred in failing to rule on the second cause of action for breach of fiduciary duty.

## C. *Corporations Code section 1601*

### 1. *Procedural Background*

Suprema appeals from the portion of the judgment ordering it to provide Jara, Sr., with "access to monthly financial statements" and awarding attorney fees in an amount to be determined by motion.[6] In a separate and consolidated appeal (A104666), Suprema appeals from a postjudgment order entered September 26, 2003, setting the award of attorney fees at approximately $84,300. Jara, Jr., and Rodriguez join in Suprema's appeals.

The procedural history of these appeals involves rights afforded by five sections of the Corporations Code, which should be briefly identified at the outset. Section 1501 concerns the corporation's duty to provide shareholders with annual reports; section 1601 addresses the shareholders' right to inspect corporate records; section 1602 pertains to directors' rights of inspection; section 1603 provides for the enforcement of rights of inspection by court order; and section 1604 authorizes the award of attorney fees expended in enforcing rights to inspection under section 1601.

The original complaint and first amended complaint sought an order pursuant to section 1603 enforcing Jara, Sr.'s right as a director to inspect corporate records as provided by section 1602. The second amended complaint, filed August 16, 2002, again sought an order enforcing a director's right of inspection, but, in addition, it sought an order enforcing a shareholder's right of inspection of corporate records under section 1601 and right to receive "annual and quarterly financial statements" under section 1501, subdivision (c), as well as an award of attorney fees under section 1604.

The statement of decision found no evidence of a violation of section 1501, subdivision (c), and did not address the alleged violation of section 1602 but ruled that Suprema violated its duty of disclosure under section 1601.

---

[5] We express no opinion as to whether compensation paid to Jara, Jr., and Rodriguez was in fact excessive.

[6] All further statutory references in this part of the opinion are to the Corporations Code.

Specifically, the court found: "It is clear that on numerous occasions commencing in January 2000 plaintiff through his counsel requested monthly financial statements be provided to plaintiff. Except for year end financials these requests were ignored." Defendants "merely ignored [plaintiff's] requests and never offered access to such records and in fact denied the existence of monthly financial reports." The judgment ordered Suprema to "provide plaintiff access to its monthly financial statements upon written request for review and copying" and awarded plaintiff attorney fees "expended to enforce Corporations Code section 1601 in an amount to be determined by noticed motion."

### 2. *Factual Background*

The record discloses that plaintiff's attorney, Kenneth Nissly, wrote five letters to Jara, Jr., from January through July 2000, requesting monthly financial information. The first two letters were written in preparation for a meeting at Suprema's office on March 13, 2000. A letter faxed on February 25, 2000, stated: "I look forward to receiving Suprema's latest monthly financial statement" and a letter dated March 2, 2000, made the same request: "please fax me a copy of the most recent monthly financial statement for Suprema Meats, Inc."

Nissly's letter to Jara, Jr., dated April 18, 2000, pursued this request: "So that we may continue our discussions I would appreciate your sending us copies of the monthly financial statements for October 1999 to the most current month." A letter dated May 22, 2000, repeated: "let me request, once again, copies of current financial information for Suprema Meats, Inc. . . . Please send me . . . the monthly financial statements for 2000 fiscal year." Finally, a letter dated July 20, 2000, stated: "Also, once again I request current financial information for Suprema Meats. . . . Please provide current financial information for Suprema Meats without further delay."

In response to the second of this series of letters, Jara, Jr., called Nissly on March 2, 2000, and left a voice message that was transcribed and introduced at trial as a plaintiff's exhibit. He told Nissly that his controller "would have to do everything by hand" to give him a finalized monthly report and suggested the figures would be "basically the same" as the last fiscal year. He concluded, "Anyway, you can call me tomorrow." On March 13, 2000, Nissly and his accountant, Roberto Maragoni, met with Jara, Jr., and Rodriguez at Suprema's office. Maragoni testified that he did not recall asking for financial documents at the meeting.

The trial court's finding that Suprema ignored requests for financial statements appears to refer to its responses to Nissly's next three letters. The

record reveals that negotiations broke down after defendants received the letter dated April 18, 2000, and defendants did ignore Nissly's later requests for information. At trial, the court found: "clearly there were requests for corporate documents. The response was not, 'Come down to the corporate office and we'll give them to you'; the response was, 'We don't have them. They're not—they're corrupted. They're this, they're that.' " The allusion to documents being "corrupted" refers to the term Jara, Jr., used in testifying that the company's software malfunctioned for a period of time.

The practical importance of these requests for disclosure under the Corporations Code came to an end with the commencement of litigation. Jara, Sr., then sought and obtained extensive production of financial documents through discovery proceedings. When the second amended complaint alleging violation of section 1601 was filed, defendants had already produced all the documents requested prior to the litigation. Moreover, as an affirmative defense in their answers filed December 6, 2000, and February 14, 2002, defendants formally stated that accounting books and records were available for inspection at the company offices.

At trial, Suprema's accounts receivable clerk, Salvador Huerta, and its accountant, Barry Goldstein, testified at length concerning available monthly financial information. The company used an accounting program that generated monthly financial statements, including income and expense statements and balance sheets, which were kept in binders in the office. Since the company took inventory only once a year, the computer-generated monthly statements gave an accurate figure for inventory only in the first month of the fiscal year. According to Huerta, the company's computer program experienced problems throughout 2000. Certain items appeared in a suspense account rather than in the correct accounting category in the computer-generated monthly statements.

### 3. Legal Analysis

The portion of section 1601 relating to a shareholder's right to inspect financial records provides:[7] "(a) The accounting books and records . . . of any domestic corporation . . . shall be open to inspection upon the written demand on the corporation of any shareholder . . . at any reasonable time during usual business hours, for a purpose reasonably related to such holder's interests as a

---

[7] The statute also applies to inspection of corporate minutes, but Jara, Sr., does not complain of any denial of this right. For earlier history of the statute and common law background, see *Most v. First Nat. Bank of San Diego* (1966) 246 Cal.App.2d 425, 429 [54 Cal.Rptr. 669]; *Austin v. Turrentine* (1939) 30 Cal.App.2d 750, 762 [87 P.2d 72].

shareholder . . . . [¶] (b) Such inspection by a shareholder . . . may be made in person or by agent or attorney, and the right of inspection includes the right to copy and make extracts."

■ Section 1601 appears as part of a statutory scheme of corporate disclosure, which also includes sections 1602 and 1501. Section 1602 affords *directors* a still broader right "at any reasonable time to inspect and copy all books, records and documents of every kind," which may be exercised either in person or by agent. The right of inspection by a director is enforceable only by court order under section 1603 without benefit of recovery of attorney fees under section 1604. In contrast, section 1501, subdivision (a), requires corporations to "cause an annual report," with specified content, "to be sent to the shareholders" within 120 days of the end of the fiscal year. Subdivision (c) of section 1501 provides that, if no annual report "has been sent to shareholders, the corporation" must "deliver or mail" the statement to a person making a written request for it, and subdivision (f) authorizes the court to award attorney fees in a proceeding to enforce shareholder rights under the section.

All defendants argue that the scope of the duty imposed by section 1601 requires no.more than that the corporation *open financial records for inspection* at corporate offices. They note that the five letters that Nissly wrote to Jara, Jr., demanded that monthly financial statements be *sent* to him. Accordingly, they maintain that the five letters did not constitute a "written demand on the corporation" giving rise to the rights and obligations of section 1601. Jara, Sr., relies on the trial court's findings that defendants "thwarted" his rights of inspection by ignoring his requests for monthly financial statements. He urges that the corporation is obliged to respond to requests for financial records by offering the records for inspection at the company office.

■ In our view, defendants are unquestionably right in interpreting section 1601 as affording no more than a right to inspect and copy records at the company office. The statutory language requiring that the records "be open to inspection . . . at any reasonable time during usual business hours" clearly implies that they may be inspected at the office where the records are kept. This interpretation is consistent with the statutory context. While section 1602 gives directors a similar right to inspect records "at any reasonable time," section 1501 provides that a particular kind of record, the annual financial statement, must be "sent," "delivered," or "mailed" to shareholders. Since the Legislature did not use such expressions in sections 1601 or 1602, it may be inferred that an actual mailing or delivery was not intended. Moreover, the category of "accounting books and records" covered by section 1601 is so broad that it would be unreasonable to construe the statute as requiring the corporation to assemble and deliver voluminous documents upon receipt of a shareholder letter. The potential burden of such an

obligation is suggested by the fact that Suprema produced 4,000 pages of financial records during discovery.

■ On the other hand, we agree with the general point underlying Jara, Sr.'s argument that section 1601 can be violated by corporate action calculated to thwart exercise of the rights it extends to shareholders, i.e., by a failure to respond to a proper request, a communication rendering further requests futile, or an action impeding the process of inspection. The statute should be construed so as " 'to effectuate the purpose of the law.' [Citations.]" (*In re J. W.* (2002) 29 Cal.4th 200, 209 [126 Cal.Rptr.2d 897, 57 P.3d 363]; *Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].)

But the trial court went a step further. The findings in the statement of decision imply that a shareholder's request for financial information creates an affirmative duty to notify the shareholder that the records are open for inspection at the company office, even if the request does not accurately refer to the rights of inspection under section 1601. Any other interpretation, Jara, Sr., now argues, would weaken the statute by conditioning the right of inspection under section 1601 to a technical requirement of submitting a written demand in proper form.

We reject this interpretation of section 1601 as imposing an affirmative duty to respond to a defective written demand. First, on the present record, the defect in the shareholder's written demand was not a technical matter of form but rather an assertion of a right that the statute did not provide—a right to have broadly described financial documentation sent to the shareholder. We are not called upon here to consider the effect of a vague, ambiguous, or inartful request. The three letters at issue were clearly drafted by an attorney; they unmistakably demanded a performance to which a shareholder is not entitled by statute, i.e., to have the current or monthly financial statements assembled and delivered to the shareholder. This right of actual delivery is guaranteed only by section 1501 with respect to the annual report.

Secondly, it is a familiar rule of statutory construction that a statute "must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity." (*DeYoung v. City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722], disapproved on other grounds in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 15 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; see also *Welch v. Oakland Unified School Dist.* (2001) 91 Cal.App.4th 1421, 1428 [111 Cal.Rptr.2d 374]; *United Business Com. v. City of San Diego* (1979) 91 Cal.App.3d 156, 170 [154

Cal.Rptr. 263].) Section 1601 appears in a statutory context that allows us to infer that the Legislature was attentive to the practical consequences of authorizing the recovery of attorney fees in enforcement proceedings, i.e., section 1501 affords a similar right to recover attorney fees but section 1602 does not. The interpretation of section 1601, which Jara, Sr., favors, would inevitably result in widespread noncompliance with the statute, which would in turn open the door to litigation over attorney fees. It cannot reasonably be assumed that small closely held corporations will routinely consult counsel upon receiving shareholder correspondence—Suprema was not represented by counsel at the time the three letters were written—and corporate employees may be inclined to discard correspondence that lies outside the normal course of business. If section 1601 is broadly construed to require corporations to respond to shareholder letters that do not request inspection as limited by section 1601, a potentially burdensome response would be required of the corporation that may encourage unnecessary, if not actually predatory, litigation. Upon failing to receive the legally required response, a shareholder would have an incentive to resort to litigation with a hope of recovering attorney fees under section 1604.

We see nothing in the statutory context or public policy that would justify stretching the meaning of the statutory language "shall be open to inspection" in section 1601 so as to impose on the corporation an affirmative duty to respond to written requests for modes of disclosure falling outside the scope of the statute. The statute guarantees a shareholder's right to inspect accounting books and records at the company office at a reasonable time during usual business hours when such inspection is requested by a written demand. The remedies of a court order under section 1603 and award of attorney fees under section 1604 exist only to enforce a written demand for inspection to which the shareholder is entitled under the statute. Jara, Sr., did not make such a written demand but rather demanded that monthly financial reports be sent to him. In the absence of a violation of section 1601, the trial court erred by entering the portions of the judgment ordering Suprema to provide Jara, Sr., with monthly financial statements and awarding attorney fees, as well as by entering the postjudgment order setting the attorney fee award in the amount of $84,300.[8]

---

[8] We do not reach the question whether the trial court abused its discretion in awarding attorney fees when a violation of section 1601 was first alleged after the documents in question had already been produced in discovery.

## DISPOSITION

We reverse the judgment and the order granting plaintiff's motion for attorney fees entered September 26, 2003, and order compelling compliance with judgment entered December 4, 2003.[9]

The parties are to bear their own costs on appeal.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied September 27, 2004.

---

[9] We grant the request for judicial notice filed by Suprema on April 20, 2004.