Filed 5/14/14  Sanders v. Langmuir-Logan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NICHOLAS A. SANDERS, as Trustee, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GARFIELD LANGMUIR-LOGAN et al., <br><br> Defendants and Appellants. | G047997 <br><br> (Super. Ct. No. 30-2011-00468519) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard W. Luesebrink, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Logan Law and Rhonda L. Morgan; Everett L. Skillman for Defendants and Appellants.

Hicks, Mims, Kaplan & Burns, Robert H. Garretson and Stephen L. Kaplan for Plaintiff and Respondent.

After a court trial, the trial judge determined Garfield Langmuir-Logan (Logan) and his limited liability company, Institutional Secured Properties (the Company) were liable for elder financial abuse, deceit, and breach of fiduciary duty.  The victims were Joseph L. and Kathleen H. Sanders (and their family trust (the Trust)).  The underlying lawsuit was filed by their son Nicholas A. Sanders (Nicholas),[1] as trustee of the Trust.  On appeal, Logan and the Company maintain there was insufficient evidence to support the court's verdict, the causes of actions were barred by the statute of limitations, and the Trust lacked standing to sue.  We conclude these contentions lack merit and affirm the judgment.

I

In 1971, Joseph suffered permanent brain damage and became severely disabled following a car accident.  He received a large financial settlement from a lawsuit in 1986, and thereafter, he and Kathleen formed the Trust and sought financial investment advice.  Over a long period of time, Logan was their financial planner, he advised them with regards to designing investment portfolios, and he sold them several "investments."  They became friends and saw each other socially.

Joseph and Kathleen reached the age of 65 in 1993 and 1989 respectively.  Kathleen died in July 2006, and the following month Joseph resigned his position as trustee, appointing his two children, Nicholas and Leah K. Boyd as co-trustees.  When Joseph died four years later in February 2010, Leah resigned as trustee, leaving Nicholas as the sole trustee.

After his father's death, Nicholas learned that in 1995 Logan convinced his parents to invest the Trust's assets in various ventures, including a limited liability company (LLC) controlled by Logan.  After Logan failed to comply with Nicholas's

---

[1]        "[W]e refer to the parties by their first names for purposes of clarity and not out of disrespect.  [Citations.]"  (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

2

repeated attempts to obtain information and accountings regarding these investments, Nicholas filed a petition on behalf of the Trust seeking a full accounting of what happened to the Trust's investments and to recover those assets.

The petition alleged six causes of action. The first three requested an accounting and inspection of records, statutory damages, and the transfer of property back to the Trust pursuant to Probate Code sections 850 and 859. The remaining claims alleged civil causes of action for (1) financial abuse of an elder or dependent adult (fourth cause of action), (2) deceit (fifth cause of action) and (3) breach of fiduciary duty (sixth cause of action).

The Trust sought to hold liable the following entities: (1) Logan; (2) the Company; (3) Statewide Barstow, LLC; (4) Statewide Barstow II; (5) Statewide Ministorage LLC, (6) Statewide Ministorage/Barstow, LLC; (7) ISP/Jurupa, LLC; (8) Montrose Apple Valley, LLC; (9) Wealth Management Resources, Inc. (WMR); and (10) Capital Financial Consultants, Inc. At trial, the Trust dismissed all the defendants except Logan and the Company.

Before trial, the parties stipulated to the following facts: On December 31, 1995, Joseph and Kathleen purchased an interest in the Company via the Trust. It was undisputed Logan was the Company's president and according to the balance sheet "a significant portion of [the Company's] assets are loans to Logan and his entities." One of the loans was made to a corporation entirely owned by Logan called Institutional Secured Properties, Inc. (hereafter the Corporation). The parties stipulated the Corporation has "a similar name" to the Company (Institutional Secured Properties, LLC). Finally, the parties stipulated the Trust had "not made a written demand upon the Company to initiate an action against Logan for any alleged wrongful acts."

At trial, Nicholas presented evidence showing Logan is an attorney, a licensed securities dealer, a stockbroker, and a registered investment advisor. Logan met Joseph and Kathleen in the 1980's, when he was a registered investment advisor. At the

3

time, he was working with the brokerage firm Cruttenden & Co. Logan then became a partner at "Hagerty & Stewart" and then moved to "H Beck." As an investment advisor, Logan provided Joseph and Kathleen with investment advice and acted as an intermediary in placing their funds to invest in various securities. In 1995 (when Joseph and Kathleen were both over the age of 65), Logan suggested they invest with him in the Company.

Nicholas's theory at trial was the Company was a sham. He presented evidence indicating Logan formed the Company to lure in investors to purchase and develop a specific piece of real estate that he intended to sell and secretly divert the proceeds to himself, family, and friends. Logan accomplished the diversion without raising any suspicion by representing on financial records the Company made several loans as investments, each called "note receivable," and designating the loans as company "assets." In addition, Logan reported the Company had received income from its investments, which proved to be untrue and wrongfully generated tax liability to the various member investors. Thereafter, when Nicholas took over as trustee, Logan refused to timely provide documentation and an accounting of the Trust's investment.

A. *The Company's Operating Agreement*

The Company's operating agreement (the Agreement) stated it was formed in October 1994 "for the purpose of purchasing, managing, developing, renting, and holding for eventual sale a certain parcel of real property located in Riverside County [described in exhibit A], and to pursue any other business investment opportunities as the Members shall determine may be beneficial for the Company."

The Company was "capitalized" by the contribution of $1,100,000 by "Class A Members" and $1,000 from Logan, the sole "Class B Member." The Agreement stated the Company would also borrow $600,000 as evidenced by a promissory note secured by the property. The Company's members were listed in the Agreement's exhibit B. "Class A Members" included the following five entities:

4

(1) Werdna L. Burnes, M.D., trustee of a medical group's profit sharing plan (hereafter Burnes) contributed $300,000; (2) Donald and Grace Modglin, co-trustees of their trust contributed $100,000; (3) Charles E. Buggy, trustee of his trust contributed $500,000; (4) Charles E. Buggy as custodian of Commercial Center Bank contributed $100,000; and (5) Carmen Major, trustee of her trust contributed $100,000.

Logan was appointed the president and manager of the Company. There were no other officers or employees. The Agreement required the Company's members to execute a limited power of attorney appointing Logan "as their true and lawful agent and attorney-in-fact, in his name, place and stead, to make, execute, acknowledge, swear to, and file [documents on the Company's behalf and relating to its operation such as notes, instruments, deeds of trust]." Having delegated all their authority, there were no meetings held by the Company's members and all decisions were entrusted to the president, Logan.

Because the Agreement was prepared by Logan's law firm (the Busch Firm) and with his assistance, the final paragraph contained a conflict of interest waiver. It stated the Busch Firm had represented all the members and may do so again in the future. The waiver advised the members there were potential conflicts of interest and it would be in their "best interest to seek the advice of independent legal counsel."

The Agreement specified the Company's members were not authorized to demand the return of their capital contribution or receive any distributions, except as provided for in the Agreement. Moreover, the Agreement specified there would be "[n]o [p]referential [r]eturn" among the members, meaning "no [m]ember shall have preference over any other [m]ember, either as to the return of [c]ontribution or distributions of profit, losses, deductions, credits or allowances." During their lifetime, Joseph and Kathleen received several cash distributions but none after 2005.

5

*B. The Initial Investment*

Joseph and Kathleen initially agreed to simply loan the Company money. However, they changed their plans and decided to purchase an interest in the Company and become one of its members. On December 31, 1995, the Trust made a capital contribution of $100,000 and obtained Burnes's Class A Membership interests. The Bush Firm prepared the assignment documents. As part of the transaction, Joseph and Kathleen were asked to execute a conflict of interest waiver, specifying they did not receive legal representation from Logan or the lawyers at his firm.

Joseph and Kathleen also executed a "limited durable power of attorney for management and disposition of real property and for other matters." (Capitalization in original omitted.) They agreed to appoint Logan to be the Trust's attorney-in-fact to file various documents on behalf of the Company and broad authority to make decisions regarding the Company's real property. Specifically, they agreed Logan had authority "[t]o manage, control, lease, sublease, and otherwise act concerning [the Trust's] interest in the real property held by [the Company] of which [the Trust] is a member described in this instrument; to collect and receive rents or income therefrom; pay taxes, charges, and assessments on the same; repair, maintain, protect, preserve, alter, and improve the same; commit the Company's resources and contract on the Company's behalf regarding the same; and do all the things necessary or expedient to be done in connection with the property upon requisite approval of the [m]embers of the Company."

*C. The Company*

As planned, the Company purchased real property on Jurupa Road in Riverside County (the Jurupa Property). In 1999, the Company sold the property. Having available a large sum of money, the evidence showed Logan began to secretly siphon off cash to himself, family, and friends.

Logan provided Joseph and Kathleen with financial information falsely showing money had been invested, and the Company acquired several assets, each called

a "note receivable."  There were a total of six purported notes from the following entities: (1) $5,000 from "C. Logan" who was either Logan's ex-wife Charm Logan or his son Collin Logan; (2) $124,137.36 from "G. Logan," representing cash to Logan personally; (3) $190,026 from the Corporation (owned solely by Logan); (4) $120,000 from "Law Office" and Logan admitted this was money given to his own law office; (5) $8,274.09 from "Logan Diversified" a partnership in which Logan was the general partner and only remaining partner; and (6) $20,000 from "Parks Diversified" who Logan acknowledged was really a former classmate and business partner.  We will discuss each transfer separately, but the fact common to them all was Logan's inability to produce at trial loan agreements, promissory notes, or any documentation created at the time the purported loans were made.

*D.  Note Receivable From C. Logan*

Exhibit 203 contains the Company's balance sheet.  It lists a "note receivable" from "C. Logan."  Logan testified in his deposition this was a loan to his ex-wife Charm.  He did not recall why the Company loaned her money, if there was any documentation, the terms of the loan, or if the loan had been repaid.  At trial, Logan remembered Charm was a signatory on the account and made a $5,000 disbursement to herself in 1999.  However, he still did not remember any details about the terms or status of the loan other than the fact it had not been paid back and there had been no interest payments.  Logan added that he and Charm divorced in 2005, and she obtained a temporary restraining order (TRO) preventing him from liquidating assets.

Nicholas presented documentary evidence disputing Logan's story.  The Company's general ledger stated the "note receivable" was created after the Company issued a $5,000 check to Logan's son, Colin, on December 10, 2009.  This $5,000 payment was made four years after the divorce and there was no evidence Charm retained signing authority or access to the Company's records.  Logan did not submit a copy of the TRO or other evidence proving the cash was distributed to Charm in 1999.

7

*E. Note Receivable From G. Logan*

At his deposition, Logan stated this was a personal loan to himself. Logan admitted he negotiated the loan but did not recall its terms. Logan testified the loan was repaid and then borrowed again. At trial, Logan told a different story. Logan stated he loaned himself money in 1999 (following the sale of the Jurupa Property) and the loan was partially repaid. He explained the loan had an interest rate of 5 percent and he paid it back sporadically, based on his cash flow. He provided a schedule of amounts due (page 6 of exhibit 203). He explained the outstanding balance was $124,137.36 with accrued interest owing of $78,762.85. Logan testified there was a note documenting the "loan" but he could not find it.

The schedule Logan submitted shows there were numerous small and large cash payments (ranging from $1,000 to $90,000) from 1999 through to August 2009. At one point in 2002, Logan owed over $230,000. The schedule also reflects Logan made only a half dozen payments on the "loan" starting in 2001 ($10,000) and ending in 2004 ($1,000). Based on this evidence, Nicholas argued Logan was using the Company as his personal piggy bank.

*F. Note Receivable From the Corporation*

Logan is the sole shareholder and owns 100 percent of the Corporation. He is the only officer of the Corporation. At his deposition, Logan could not recall the terms of this "loan." However, at trial Logan testified the Company loaned the Corporation money in 2009 and there was a 6 percent interest rate. This testimony is refuted by a payment schedule Logan submitted showing the first $5,000 check was issued to the Corporation in December 1998.

The one and one-half page "schedule," like the one Logan produced to account for his personal loan, reflects a series of cash payments over from 1998 to 2008. It shows approximately 50 separate distributions to the Corporation ranging from $3,000 to $50,000 and intermittent repayments from the Corporation. At one point in 2005, the

8

Corporation had received a total of over $330,000. The last entry on the schedule, December 2008, shows a balance owed of $190,026.

At his deposition, when Logan was asked about the payments to his Corporation, he admitted it was his practice to borrow money from one of his entities "that had cash and loan it to other entities." He explained, "For example, there was money needed for property taxes and other maintenance and insurance for Montrose Apple Valley. So what I did is I borrowed money from [the Company] and then lent it to [my Corporation] and then lent it back out to pay those expenses for Montrose." When asked about Montrose at trial, Logan disclosed it had been wound down and liquidated and the land sale proceeds distributed to the members "and all expenses paid." He did not explain why $190,000 was still owed to the Company.

G. *Note Receivable From the Law Office*

Logan admitted he gave his own law office money starting in 1999 (the year the Company sold the Jurupa Property). Logan testified the first advance was for $20,000. He submitted a schedule showing the law office received checks from 1999 to 2010, ranging from $2,000 to $49,000. Over this 10 year period, the law office made just two repayments, (1) $60,000 split between December 31, 2001 and January 4, 2002, and (2) $47,000 five years later in December 2006. Logan calculated his law office currently owed the Company $120,000.

Logan's bookkeeper, Gilbert Barragan, testified he prepared and maintained separate excel worksheets of the law office's loan. There were no other documents produced regarding the terms of this loan.

H. *Note Receivable From Logan Diversified*

Logan Diversified, LP (hereafter LDL) is a partnership in which Logan is the only partner. Logan testified several members of his family were initially limited partners, but now he is the sole partner. In his deposition, Logan testified the partnership was created in the 1990's to invest in real estate and securities. Logan stated he

9

negotiated the loan on behalf of the Company and LDL, and he could not remember the terms of the loan or whether it had been repaid. But at trial, Logan recalled the terms of the loan was 5 percent interest and began in 2010. However, this testimony was contradicted by accounting documents, including exhibit 203, showing the Company made a $2,000 cash transfer to LDL in April 2001. The schedule shows a series of payments from 2001 to 2008, reaching a peak of $59,500 in 2005. From 2009 to 2011, LDL made many repayments (each approximately $320) after LDL had stopped withdrawing cash from the Company.

Nicholas submitted the Company's 2009 balance sheet showing a note receivable to LDL for $15,700.82. A 2012 balance sheet showed the note was reduced to $8,274.09. No other documents were submitted regarding the terms of this note.

*I. Note Receivable From Parks Diversified*

Logan testified this note refers to a loan he made to the partnership Parks Diversified, an investment firm owned by Lucy and Rich Parks. Logan stated the Parks were former clients and business partners in real estate projects. Logan stated he negotiated the terms of the loan, but he did not remember them. The Company's 2012 balance sheet showed the note was for $20,000.

More details regarding the cash withdrawal can be found in exhibit 203. The financial statements Logan submitted indicate the Company loaned Parks Diversified $50,000 in May 2009, of which $30,000 was repaid the following month. No other payments have been made for several years. The financial statements also show the loan has an interest rate of 5 percent and close to $3,000 accrued interest. No other documents were submitted regarding this note.

*J. Trial Briefs*

At trial, the court asked the parties to submit briefs instead of oral closing arguments. In addition to recounting the evidence the Company's profits were improperly distributed, Nicholas discussed other evidence of misconduct. He asserted

10

Logan breached the Company's Agreement.  Specifically, in violation of sections 10.1 and 10.2 of the Agreement, Logan never called an annual or special meeting for the members.  Section 8.2, subdivision (o), authorized self-dealing but only on terms "equal to, or better than, those obtainable from unrelated parties."  None of the purported loans were on good terms.  Additionally, Nicholas noted Logan violated Corporations Code section 17106 by refusing to allow inspections of the Company's books and records.

Nicholas also asserted the stated purpose of the Company was to manage a specific piece of real property.  He stated that when the Jurupa Property was sold, Logan did not distribute the proceeds to the members and dissolve the company, nor did he reinvest in additional real property.  Rather, he distributed a small sum to the members and held a substantial amount of money back for himself.  Large cash distributions taken from the Company's account would have been easily identified by investors.  Nicholas argued Logan concealed cash payments to himself (and his related entities) by disguising the transfers as "notes" on the Company's balance sheets.  Because the Company was created to invest in secured properties, Logan's use of the term "note" would not be an obvious red flag to the investors inspecting the financial ledgers.

And finally, Nicholas presented evidence Logan wrongfully generated tax liability to the members.  The Company claimed to have income in 2008, 2009, and 2010, but this was proven untrue.  Nicholas argued this phantom income became an unnecessary tax liability for the members.

K. *Damages*

In his closing argument brief, Nicholas argued all the alleged false investments occurred when Joseph and Kathleen were "elders" and therefore victims of financial elder abuse.  He argued that in addition to recovering the funds that were taken, the Trust was seeking statutory damages under Probate Code section 859, punitive damages, and attorney fees.  Nicholas calculated the amount of general damages based on the Trust's ownership interest in the company plus the tax paid on the phantom income.

11

He calculated damages by determining the Company's worth based on the amount of cash, loans, and accounts receivable. The Trust's ownership interest (22.5718 percent) of the Company's worth ($907,702) was $204,884.89. It calculated the tax bill for three years of phantom income to be $2,335.90. The total damages equaled $207,220.79.

*L. The Court's Ruling*

The court ruled in favor of the Trust. In its statement of decision, the court explained it was necessary to discuss the background of the dispute "to appreciate the factual and legal difficulties presented by this case." The court explained the petition was filed by Nicholas, the successor trustee and the initial trustors were both deceased. It stated, "Beginning in 1995, or thereabouts . . . Logan had discussions with Kathleen and Joseph about investing the [T]rust's assets with Logan, which allegedly [they] did. The Trust's assets were invested in various entities including various [LLCs], corporations, and other entities. Besides Logan, the other remaining [r]espondent is [the Company] of which Logan is apparently the CEO, director, and sole shareholder. All other [r]espondents were dismissed."

The court noted the petition alleged Joseph and Kathleen invested at least $784,000 of Trust assets with Logan and Wealth Management Resources. It concluded, "The [c]ourt finds from the evidence presented that Logan and [the Company] 'took secreted, appropriated and/or retained real or personal property that belonged to Joseph and Kathleen as trustee and beneficiary of the Trust for a wrongful use or with intent to defraud.' [The court cited paragraph 83 of the petition's fourth cause of action.] Likewise, the fifth cause of action incorporates paragraph 83 [of the petition] and alleges that Logan suppressed information, failed to disclose information and misled Joseph and the [Trust] in [six] different respects. In the sixth cause of action [the Trust] incorporates paragraph 83 as well as the preceding paragraphs and further in paragraph 96 that Logan 'breached his [f]iduciary [d]uties to the Trust by failing to account, refusing to provide documentation, investing the Trust's money in high risk investments, self-dealing with

12

entities in which both Logan and the Trust had an economic interest, and self-dealing with entities for which Logan was a manager, officer, or agent, and in which the Trust had invested funds.'  Based upon all of the evidence presented both testimonial and documentary, the [c]ourt is satisfied that [the Trust] proved the allegations in the [fourth, fifth, and sixth] causes of action—the [fourth] cause of action by clear and convincing evidence."

In addition, the court indicated there was an interchangeable relationship between Logan and the Company, stating, "Logan *was* [the Company] and the result was an abominable lack of documentation and record-keeping of [the Trust's] account without justification and in violation of [r]espondent's fiduciary duties to [the Trust.] [2] As a result, the [c]ourt's decision is that [the Trust] proved economic damages of $207,220.79 and is entitled to [j]udgment on the [fourth, fifth, and sixth] causes of action as well as attorney fees.  [¶]  In the event [r]espondents satisfy the judgment in part or in whole, the distribution shall be applied to reduce [the Trust's] interest in [the Company] but in no event below zero."  (Italics added.)

II

*A.  Standing*

Logan and the Company allege "the Trust lacked standing to assert any direct cause of action related to the loans."  (Original capitalization omitted.)  They assert, "the evidence adduced at trial dealt primarily with the transfers of funds [from the Company] to Logan and related entities."  They assert the members of a limited liability company do not have a direct interest in the company's assets, and therefore the alleged acts of misconduct relate to mismanagement of the Company's business.  Logan and the

---

[2]      It is unclear if the trial court's reference to "respondent" in this sentence was referring to Logan or the Company, and consequently, we have left the court's ruling as written.

13

Company allege the lawsuit seeks to recover assets for the Company, and therefore, required the filing of a derivative action. We disagree.

The Trust's complaint alleged causes of action for elder financial abuse, deceit and breach of fiduciary duty. As aptly noted by Nicholas, elders and dependent adults can sue their abusers and anyone who assists in the abuse. (See Welf. & Inst Code, § 15600, subd. (j).) Logan fails to address this point. Moreover, the gravamen of the lawsuit related to more than just the alleged wrongful transfer of funds from the Company. Nicholas argued Logan, acting in the role of a financial advisor, wrongfully convinced Nicholas's elderly parents to invest a large sum of their money (the Trust's assets) with one of Logan's companies. Logan then acquired complete control of those assets by requiring Joseph and Kathleen to provide him with broadly worded durable powers of attorney to act on their behalf. Logan then secretly diverted away the profits from their investment in the Company to himself. In essence, Nicholas argued the entire investment was a sham, not just the wrongful diversion of the profits.

Logan and the Company contend the case is solely about mismanagement of the Company's assets, but the record does not support this claim. And on appeal they offer an overly simplistic analysis of why the action must be brought as a derivative lawsuit. As we will now explain, not all claims relating to a company's assets necessarily involve injury to the company.

*i. Case Authority on Derivative vs. Direct Actions*

The parties agree the principles of derivative lawsuits applicable to corporations likewise apply to a limited liability company such as the Company. In 1994, the Legislature enacted Corporations Code sections 17000-17655 governing limited liability companies. The law incorporates provisions of the Corporations Code. [¶] 'A limited liability company is a hybrid business entity formed under the Corporations Code and consisting of at least two "members" [citation] who own membership interests [citation]. The company has a legal existence separate from its

14

members.  Its form provides members with limited liability to the same extent enjoyed by corporate shareholders [citation], but permits the members to actively participate in the management and control of the company [citation].'  [Citation.]"  (*PacLink Communications Internat., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963 (*PacLink*).)

The leading case on the distinction between derivative and individual direct causes of action is *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93 (*Jones*).  "A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act.  Thus, 'the action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.'  [Citations.]  'A stockholder's derivative suit is brought to enforce a cause of action which the corporation itself possesses against some third party, a suit to recompense the corporation for injuries which it has suffered as a result of the acts of third parties.  The management owes to the stockholders a duty to take proper steps to enforce all claims which the corporation may have.  When it fails to perform this duty, the stockholders have a right to do so.  Thus, although the corporation is made a defendant in a derivative suit, the corporation nevertheless is the real plaintiff and it alone benefits from the decree; the stockholders derive no benefit therefrom except the indirect benefit resulting from a realization upon the corporation's assets.  The stockholder's individual suit, on the other hand, is a suit to enforce a right against the corporation which the stockholder possesses as an individual.'  [Citation.]"  (*Id.* at pp. 106-107.)  *Jones* clarified that "[t]he individual wrong necessary to support a suit by a shareholder need not be unique to that plaintiff.  The same injury may affect a substantial

15

number of shareholders.  If the injury is not incidental to an injury to the corporation, an individual cause of action exists." (*Id*. at p. 107.)

Applying the above principles, the *Jones* court determined plaintiff, a minority shareholder, had standing to file a direct action.  Plaintiff alleged the majority shareholders of the corporation breached their fiduciary duty by creating an independent holding company to which they transferred their control block of shares, making their own interests more marketable and destroying the market value of the shares held by the minority.  (*Jones, supra*, 1 Cal.3d at pp. 102-105.)  The court explained that under these circumstances plaintiff "does not seek to recover on behalf of the corporation for injury done to the corporation by defendants.  Although she does allege that the value of her stock has been diminished by defendants' actions, she does not contend that the diminished value reflects an injury to the corporation and resultant depreciation in the value of the stock.  Thus the gravamen of her cause of action is injury to herself and the other minority stockholders." (*Id*. at p. 107; see also *Smith v. Tele-Communication, Inc.* (1982) 134 Cal.App.3d 338, 341-343 [minority shareholder's suit to share in tax savings payment to majority shareholder was properly brought as individual action because corporation was unaffected]; *Sheppard v. Wilcox* (1962) 210 Cal.App.2d 53, 55-56, 64 [minority shareholder's suit challenging directors' decision to issue additional common stock, which caused them to become majority shareholders, was properly brought as individual action because corporation unaffected].)

As *Jones* explains, majority shareholders have a fiduciary duty not only to the corporation but also directly to the minority shareholders.  "[M]ajority shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner.  Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority.  Any use to which they put the corporation or their power to

16

control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business.  [Citations.]"  (*Jones, supra*, 1 Cal.3d at p. 108.)  Simply stated, direct actionable injury may result when controlling stockholders breach their fiduciary duty to minority stockholders.

Although the distinction between derivative and direct actions can be succinctly articulated, the case law is difficult to fully reconcile.  As explained by one treatise, courts may apply equitable principles when the case deals with a closely held corporation.  "[H]armful acts by one officer/shareholder may directly impact the other shareholders, and hence courts are more willing to allow direct actions."  (Friedman et al., Cal. Practice Guide: Corporations (The Rutter Group 2010) ¶ 6:601a, p. 6-131 (hereafter Friedman), citing *Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238, 1253-1254 (*Jara*).)

We conclude the trial court properly allowed the Trust's direct action.  The gravamen of the complaint is Logan deliberately and methodically executed a scheme to steal the Trust's assets to benefit himself and his business interests.  The Trust asserted Logan breached his fiduciary duty to make appropriate distributions of the profits to the other investors.  The Trust sought to regain the right to control its investment, not any right on behalf of the Company.  Indeed, the thrust of the complaint was not that Logan mismanaged the Company or used poor business judgment that resulted in a general decreased value of each member's equity share.  The Trust did not seek damages to address any alleged wrongdoing to the Company's interests.

Courts have repeatedly held a minority shareholders' claims are direct in cases involving sale of a corporation or of corporate assets that are allegedly designed to disproportionately benefit the majority shareholders.  (See *Low v. Wheeler* (1962) 207 Cal.App.2d 477, 481-482 [majority shareholder sold plaintiff's stock first and at a lower price than what he negotiated for his own stock, "the wrong . . . was one to plaintiff as an individual, because the corporation was about to be dissolved"]; *Crain v. Electronic*

17

*Memories & Magnetics Corp.* (1975) 50 Cal.App.3d 509, 515-516, 521-522 [majority shareholders sold corporation's assets, made unsecured loan of sale proceeds to themselves, and purchased all minority shares except the founders' promotional shares, leaving those shares in the "'shell' corporation" worthless, the founders had individual causes of action].)

Similarly, claims that managing majority shareholders paid themselves excessive compensation are direct claims. We find instructive *Jara, supra,* 121 Cal.App.4th 1238. The *Jara* case involved a three-shareholder corporation in which a minority shareholder sued to recover excess compensation from the two other majority shareholders. (*Id.* at p. 1242.) Plaintiff claimed defendants used their control of the corporation to increase their salaries as corporate officers to more than the amount agreed to by all three shareholders, with the objective of reducing the amount of profit they had to share with plaintiff. (*Id.* at p. 1258.) In permitting plaintiff to sue directly, the court noted plaintiff was not alleging the extra compensation injured the corporation "but rather maintain[ed] that the payment of generous executive compensation was a device to distribute a disproportionate share of the profits to the two officer shareholders during a period of business success." (*Id.* at p. 1258.)

The court held the allegations did not implicate the policies behind the rule requiring suits alleging injury to a corporation be brought by the corporation itself or in a derivate action, stating, "The objective of preventing a multiplicity of lawsuits and assuring equal treatment for all aggrieved shareholders does not arise at all when there is only one minority shareholder. The objective of encouraging intracorporate resolution of disputes and protecting managerial freedom is entirely meaningless where the defendants constitute the entire complement of the board of directors and all the corporate officers. And the policy of preserving corporate assets for the benefit of creditors has, at best, a very weak application where the corporation remains a viable business." (*Jara, supra,* 121 Cal.App.4th at p. 1259.)

18

Similarly here, Logan's payment of hundreds and thousands of dollars to himself and his other interests can be viewed as essentially the overpayment of executive compensation. The evidence showed Logan withdrew great sums of cash for his own benefit each month for over a decade. Given his initial investment in the Company was a mere $1,000, these large cash distributions certainly represent a disproportionate share of the Company's profits. Like the shareholder in *Jara,* the Trust did not allege the extra compensation harmed the Company. However, by paying himself more money, Logan reduced the amount of profit he had to share with the other limited liability company members. Moreover, as in *Jara*, this case does not implicate the policies behind the derivative actions because Logan was the only person running the Company and would not have agreed to sue himself. "[P]rotecting managerial freedom is entirely meaningless where the defendants constitute the entire complement of the board of directors and all the corporate officers." (*Jara, supra,* 121 Cal.App.4th at p. 1259.)

And finally, we note the cases relied on by Logan and the Company are inapt. Those cases held a minority shareholder's claims are derivative in cases of alleged mismanagement by majority shareholders leading to the corporation's demise. (See *Avikian v. WTC Financial Corp.* (2002) 98 Cal.App.4th 1108, 1111-1113, 1115-1116 [defendant officers and directors mismanaged or looted corporate assets and entered into self-serving deals to sell assets to third parties, culminating in the corporation's involuntary liquidation]. For example, the court in *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 126-127, determined that where the wrongful acts of a majority shareholder amounted to misfeasance or negligence in managing the corporation's business, causing the business to lose earnings, profits, and opportunities, and causing the stock to be valueless, the claim was derivative and not individual because the resulting injury was to the corporation and the whole body of its stockholders. Similarly, *PacLink, supra,* 90 Cal.App.4th at pages 964-965, was a case involving the fraudulent transfer of the assets of a limited liability company, without the payment of

19

compensation to the company.  The court held the gravamen of the fraud was injury to the company requiring a derivative action because the fraudulent transfer constituted an injury to the LLC itself and not plaintiffs, who held no direct ownership interest in the company's assets.  (*Ibid.* [diminution in the value of the members' 38 percent ownership interest was incidental to injury to company, which was improperly deprived of its assets].)

In conclusion, we agree with the trial court's determination the Trust could bring a direct action because it was seeking the return of funds purportedly taken as compensation.  It was not seeking to recover for an injury suffered by the whole body of the LLC.  Stated another way, the record shows the Trust sought to recover money lost in Logan's scam, not a derivative claim on behalf of the Company.

## B.  *Sufficiency of the Evidence*

Logan and the Company assert the Trust failed to establish a prima face case of fraud against Logan.  We conclude there is sufficient evidence to support the court's finding on the causes of action of elder abuse, deceit, and breach of fiduciary duty.

### i.  *Standard of Review*

The applicable standard of review is whether there was substantial evidence to support the judgment that the trial court actually entered, not whether there would have been substantial evidence to support a contrary judgment.  "'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below.  [Citation.]  We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .'  [Citation.]"  (*Bickel v.*

20

*City of Piedmont* (1997) 16 Cal.4th 1040, 1053; disapproved on another ground as stated in *DeBerard Properties, Ltd. v. Lim* (1999) 20 Cal.4th 659, 668.)

        *ii.  Elder Financial Abuse*

        Welfare and Institutions Code section 15610.30 defines financial abuse and section 15657.5 identifies the available remedies.  As noted by Logan and the Company, the elder abuse statues have been amended numerous times, and the amendments do not apply retroactively.  (*Das v. Bank of America N.A.,* (2010) 186 Cal.App.4th 727, 735 (*Das*).)

        It appears, however, that each version requires not only that the defendant obtain some money or property of the elder, but also that the defendant do so wrongfully. The wrongfulness element can be satisfied by fraud, constructive fraud, undue influence, embezzlement, or conversion.  (See Balisok, Elder Abuse Litigation (The Rutter Group 2009) Financial Abuse, § 8.21 ["The range of possible schemes that might be addressed by remedies for financial abuse is too broad for comprehensive treatment.  Each scheme, however, will be presumptively fraudulent or the product of actual fraud, undue influence and/or mistake"].)

        The version of section Welfare and Institutions Code section 15610.30 in effect at the time the misconduct occurred provided:  "The substantive law of elder abuse provides that financial abuse of an elder occurs when any person or entity takes, secretes, appropriates, or retains real or personal property of an elder adult to a wrongful use or with an intent to defraud, or both.  A wrongful use is defined as taking, secreting, appropriating, or retaining property in bad faith.  Bad faith occurs where the person or entity knew or should have known that the elder had the right to have the property

21

transferred or made readily available to the elder or to his or her representative. [Citation.]" (*Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 174 (*Teselle*).)[3]

    We fail to see how this version, as opposed to later versions, assists Logan. There was ample evidence to support the trial court's conclusion Logan wrongfully took Joseph and Kathleen's money in bad faith. Logan created a special relationship with Joseph and Kathleen, earning their trust, confidence, and reliance. He first acted in the role of a trusted financial advisor, and then convinced Joseph and Kathleen to execute durable powers of attorney, making them even more dependent and reliant on his judgment. He owed them a fiduciary duty as their financial broker, attorney in fact, and co-member/manager of the LLC. He misused their confidential relationship. He induced the elderly couple to invest in a sham company and then kept the majority of the profits for himself. To hide his misconduct, Logan falsely represented on financial documents the cash transfers to himself were notes receivable when in fact there were no actual promissory notes, no accrued interest, and no investment loans. Logan also reported phantom income from non-existent loans, creating unnecessary tax liability for Joseph and Kathleen.

    We agree with the trial court's conclusion this conduct certainly qualifies as a taking or appropriation in bad faith, as defined by the statutory scheme existing from 1998 to 2008. Logan, particularly in light of his many fiduciary roles, "knew or should have known that the elder[s] had the right to have the property transferred or made

---

[3]   From 2001 to 2008 the wrongfulness element could be satisfied by "bad faith" and this standard was criticized as "simply not understandable." (Balisok, Elder Abuse Litigation (The Rutter Group 2008) ¶ 8:1.) In 2008, the Legislature amended Welfare and Institutions Code section 15610.30, subdivision (b), to provide: "A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder . . . ."

22

readily available to the elder or to his or her representative.  [Citation.]"  (*Teselle, supra,* 173 Cal.App.4th at p. 174.)

### iii.  Statute of Limitations

"An action for damages pursuant to [s]ections 15657.5 and 15657.6 for financial abuse of an elder or dependent adult, as defined in [s]ection 15610.30, shall be commenced within four years after the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse." (Welf. & Inst. Code, § 15657.7.)  Logan and the Company assert the elder abuse is barred because the causes of action accrued in 2003, but the petition was not filed until 2011. Logan asserts Nicholas and his sister were required to file the claim no later than 2007. We disagree.

Logan asserts the evidence showed Joseph and Kathleen possessed a financial statement as early as 2003 "clearly showing at least one loan had been made to Logan."  He explains the elderly couple were put on inquiry notice to investigate potential wrongdoing in 2003 and Nicholas's claim to have discovered the relevant facts in 2010 is irrelevant.  Not so.

We find it somewhat ironic Logan is relying on financial documents he prepared as part of his scheme to successfully hide wrongful cash distributions from his co-members as evidence they should have seen through his deception and made inquiries. We agree with the trial court's conclusion Logan's prepared financial documents would have reasonably alerted Joseph and Kathleen that Logan was making cash distributions to himself.  Logan concealed the true nature of his wrongdoing by falsifying the financial documents, showing the Company had made investments called notes receivable, and the Company's tax documents reported income was generated.  There is no evidence to support the notion Joseph and Kathleen should have been aware the notes were fictitious, that the Company was a sham, or that Logan was in fact paying himself from the profits generated from their original real estate investment.  To the contrary, calling the cash

23

disbursements "notes" in a business having the purpose of investing in real property cleverly hid the truth. In a real estate investment company, a "note" would not have reasonably aroused any suspicion. And since Logan made some cash disbursements to Joseph and Kathleen, they were falsely led to believe their real estate investment was sound. We agree with the trial court's conclusion the misleading financial documents would not have put Kathleen and Joseph on inquiry notice something was in fact terribly wrong.

### iv. *Deceit & Breach of Fiduciary Duty*

We need not address whether there was substantial evidence to support these two causes of action because the damage award could be based on the elder abuse claim standing alone. The Trust pled several causes of action all arising from the same harm. Having found substantial evidence supports one, it would serve no purpose to confirm the award with additional liability.

### v. *The Company's Liability for Elder Abuse*

The Company asserts it cannot be held liable for Logan's acts of financial elder abuse. It recognizes the elder abuse statute scheme extends liability to those who "assist[] in" the abuse. (Welf. & Inst. Code, § 15610.30, subd. (a)(2).) The Company argues there is no evidence Logan committed the abuse, and "the provision cannot be understood to impose strict liability for assistance in an act of financial abuse." (*Das, supra*, 186 Cal.App.4th at p. 744.) It concludes there was no evidence the Company "'actually knew' (i.e., that Logan 'actually knew') that Logan was 'committing a specific tort.'"

As explained in more detail above, we have determined there was sufficient evidence for the court to hold Logan liable for elder abuse. And while the "assist[s] in" provision does not impose strict liability, in this appeal the Company fails to present any argument challenging the court's implicit conclusion the Company *actually knew* it was assisting in Logan's abuse. Its argument on appeal centers entirely on the premise there

24

was insufficient evidence Logan was liable. Our task as an appellate court is not to reweigh the evidence but to review the court's rulings for abuse of discretion. The Company's briefing is insufficient in this regard and we deem the issue waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

III

The judgment as affirmed. Respondent shall recover his costs on appeal.

O'LEARY, P. J.

WE CONCUR:

ARONSON, J.

THOMPSON, J.