Filed 1/20/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW WIMER,<br><br>        Defendant and Appellant. | A156114<br><br>(San Mateo County<br>Super. Ct. No. 17NF008503) |

California law provides that any person who knowingly distributes or exchanges obscene material involving children performing or simulating sex acts is guilty of a wobbler offense.  (Pen. Code § 311.1, subd. (a).)[1]  When a person knowingly distributes or exchanges child pornography "for commercial consideration," the offense is a felony punishable by a term of incarceration in state prison for two, three, or six years.  (§ 311.2, subd. (b).)  Matthew Wimer was convicted of four counts of distribution of child pornography for commercial consideration (§ 311.2, subd. (b)), and one count of possession of pornographic images of minors (§ 311.11, subd. (c)(1)), after he was found in possession of pornographic images and videos on computer files accessible to other users on a peer-to-peer sharing network.

On appeal, Wimer contends that the trial court erred when it instructed the jury that the element of "commercial consideration" in section

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

311.2, subdivision (b) may be established by an intent to trade in pornographic material with others, and that the evidence at trial was insufficient to support his proposed construction of this element. We agree that the trial court erred in its jury instruction and that this error necessitates a reversal of appellant's convictions under section 311.2, subdivision (b). On remand, the People may elect to retry appellant on the section 311.2, subdivision (b) allegations, or to stand by Wimer's conviction on the lesser included offense of distributing child pornography without commercial consideration (§ 311.1, subd. (a).)

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Prosecution Case*

In April and May 2017, Sergeant Christopher Servat of the San Francisco Police Department used an investigative software program to search the BitTorrent network for suspects distributing child pornography. As Sergeant Servat explained, BitTorrent is a peer-to-peer file sharing network that "is used to share, download, [and] distribute" "massive amounts of data" over the Internet, such as movies, videos, and music. The network is also used to distribute child pornography.

To download and share files over a BitTorrent network, a user must install a BitTorrent software client on his or her computer and download a "torrent" from a torrent-search website. A torrent contains information about the target files, including their names, sizes, and cryptographic "hash values," which are the numeric codes assigned to a file and considered "the DNA of a file." The software client reads the torrent, finds the pieces of the target file from other BitTorrent users who have the same torrent, and downloads and assembles the pieces, producing a complete file. Law enforcement officers have identified many hash values that are associated

2

with child pornography and use specialized forensic software to detect and download these files from other peer-to-peer users to confirm the existence of such pornography.

Typically, when a user downloads a file, it is saved in a default shared folder on one's computer that is accessible to other BitTorrent users. A user can choose not to share files by actively disabling the access setting. If a user blocks others' access to his or her collection of files, the user's connection through the BitTorrent network will be slowed down. According to Sergeant Servat, it is "typically in a user['s] . . . best interest to allow their files to be shared." The software "wouldn't work without sharing."

On April 18, 2017, Servat's software program was alerted to a computer with a particular internet protocol (IP) address that had a shared folder containing multiple files with hash values of known or suspected child pornography. Over four days in 2017, Servat connected to that computer through BitTorrent and downloaded over 900 videos and images of child pornography.

On April 18, Sergeant Servat downloaded approximately 209 images and videos depicting girls as young as 8 years old either posing nude in a sexually provocative manner or masturbating. On May 26, he downloaded a different torrent file that contained approximately 244 images and videos of girls appearing to be as young as six years old engaged in sexual conduct. The next day, Servat re-downloaded the same torrent file which contained 244 images and videos of child pornography. On May 28, Servat downloaded the same torrent file, which now had 217 files of child pornography.

Using the target computer's IP address, Sergeant Servat determined that appellant was the Internet subscriber for that address. Servat executed a search warrant of appellant's residence where officers found 817 images

3

and 10 videos of child pornography on one of appellant's computers, a Sony laptop. BitTorrent and encryption programs had been installed on appellant's other computer, a Hewlett-Packard (HP) laptop. A digital forensic examiner found evidence that torrent files containing child pornography had been downloaded to the HP laptop at some point, including the files that appellant had shared with Sergeant Servat. He also found a large encrypted file on the laptop approximately 100 gigabytes in size, capable of holding 50,000 images.

Appellant's search history on the Google search engine was also admitted into evidence, and included terms such as "sad girls spanked TGP," "rape TGP," "cruel TGP," "microbikini preteen," "microbikini child," "microbikini baby," and "amateur preteens." Other child-pornography-related search terms had been bookmarked in a web browser.

## B. *The Defense Case*

Appellant testified he had approximately 25 years of experience in computer programming. He spent about 16 hours a day, seven days a week, on his computer. Appellant was well versed in peer-to-peer networks. He admitted he used a BitTorrent network to download child pornography. When appellant installed BitTorrent on his computer, he was aware that in participating in a peer-to-peer network, "with the ability to download comes the ability to upload." He knew that his software client's settings defaulted to enable other users to access the contents of his shared folder, but claimed he did not intend to share any of the child pornography and forgot to turn off the default setting.

Appellant admitted he had obtained hundreds of thousands of images of child pornography. But he claimed he had downloaded the material as part of a project to develop an algorithm that would determine if individuals

4

in pornographic images were underage, similar to facial recognition. Appellant testified that this project could help law enforcement and other "people [who] are actually being harmed by the production of this type of material." He conceded, however, that he did not mention the project to the police after his arrest and had initially denied searching for and intentionally downloading child pornography.

## C. *Jury Verdict*

The trial court instructed the jury that to find appellant guilty of section 311.2, subdivision (b), "the People must prove that: [¶] 1. The defendant distributed or exchanged obscene matter with someone else; [¶] 2. When the defendant acted, he knew the character of the matter; [¶] 3. When the defendant acted, he knew that the matter showed a person under the age of 18 years who was personally participating in or simulating sexual conduct; AND [¶] 4. When the defendant acted, he intended to distribute, show, or exchange the matter to someone else for money or other commercial benefit." The trial court further explained: "*Commercial benefit* does not require proof that the defendant intended to profit financially from distribution of obscene matter. *Commercial benefit* includes the trade of obscene matter through the internet." In response to a jury question, the trial court clarified that a "commercial purpose" may be established by proof of an "intent to trade or induce others to trade the pornographic material" over the Internet. We discuss the court's jury instructions in greater detail below.

Following trial, the jury found appellant guilty on all four counts of knowingly distributing obscene matter showing minors engaging in sexual activity for commercial consideration (§ 311.2, subd. (b)), and one count of possession of child pornography (§ 311.11, subd. (a)(1)), including the special

5

allegation that appellant possessed more than 600 pornographic images depicting sexual conduct by minors with at least 10 images involving prepubescent minors. (§ 311.11, subd. (c)(1).)  Appellant was sentenced to state prison for a term of 4 years and 8 months.

## II. DISCUSSION

This appeal requires us to construe the element of "commercial consideration" in section 311.2, subdivision (b), and whether this element may be satisfied by proof that the defendant merely intended to trade in pornographic material over the Internet.

Familiar principles of statutory construction guide our analysis.  "We begin with the touchstone of statutory interpretation, namely, the probable intent of the Legislature.  To interpret statutory language, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632.)  " 'Our first step . . . is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]' " (*Id.* at p. 633.)  " 'In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose. . . .' " (*Id.* at p. 634.)  "When the language of a statute is clear, we need go no further.  However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  [Citations.]" (*People v. Flores* (2003) 30 Cal.4th 1059, 1063.)  Appellant's claims, which require the interpretation and

6

application of statute to the facts of this case, present questions of law subject to de novo review.  (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)

## A. Meaning of Commercial Consideration

### i. *The Trial Court's Construction as An Intent to Trade or Induce Others to Trade in Child Pornography*

Section 311.2, subdivision (b), provides in relevant part:  "Every person who . . . offers to distribute, distributes, or exhibits to, or exchanges with, others for *commercial consideration*, any obscene matter, knowing that the matter depicts a person under the age of 18 years personally engaging in or personally simulating sexual conduct, as defined in Section 311.4, is guilty of a felony and shall be punished by imprisonment in the state prison for two, three, or six years, or by a fine not exceeding one hundred thousand dollars ($100,000) . . . ."  (Italics added.)  The statute also prohibits the possession of child pornography "with intent to distribute or to exhibit to, or to exchange with, others for commercial consideration . . . ."  (*Ibid.*)

We must give meaning to each word or phrase in the statute to accomplish its legislative aim.  It is apparent that subdivision (b) criminalizes discrete acts of offering to distribute, distributing, exhibiting, or exchanging with others, obscene matter involving minors performing or simulating sex acts.  Use of the word "or" and commas separating these acts indicate that each act is subject to criminal liability under the statute.  The structure of the sentence also makes clear that the phrase "commercial consideration" is intended to modify each preceding act, as this phrase immediately follows the listed acts and is itself separated by commas.  Accordingly, conviction under section 311.2, subdivision (b) requires that a defendant who distributes or exchanges obscene matter involving sexual conduct by minors do so "for commercial consideration."  The parties do not contend otherwise.

7

The trial court instructed the jury that the phrase "commercial consideration" means an "intent to trade or induce others to trade" in child pornography, and the Attorney General urges us to adopt this construction of section 311.2, subdivision (b). Had subdivision (b) only prohibited distributing or exhibiting child pornography to others, this would be a reasonable interpretation of the law for a defendant may distribute or exhibit obscene material without intending or expecting to receive such material in return. But the Legislature also criminalized the "exchange" of obscene matter involving minors. "Trade" and "exchange" are commonly understood to be synonymous terms. (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 1325) [defining "trade" as "to give one thing in exchange for another"]; American Heritage College Dict. (3d ed. 1993) p. 144 [defining "trade" as "an exchange of one thing for another"].) If commercial consideration simply meant an intent to trade or induce others to trade, this element would be duplicative of the criminal act of exchanging obscene material with others. We must avoid a construction that makes any word or phrase in a statute surplusage, particularly a central element of a criminal offense. (See *Reno v. Baird* (1998) 18 Cal.4th 640, 658.)

This proposed reading also violates a second canon of statutory construction. When statutes are in pari materia, they "are to be construed together and harmonized to avoid nullification of one statute by another." (*Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 202.) Section 311.1, subdivision (a) is nearly identical to section 311.2, subdivision (b), making the distribution of child pornography a wobbler offense when the element of commercial consideration is absent.[2] (Stats. 1994, ch. 874, § 1, p.

---

[2] Section 311.1, subdivision (a) provides that any person who knowingly "offers to distribute, distributes, or exhibits to, or exchanges with, others, any

8

4430, see Legis. Counsel's Dig., Assem. Bill No. 2701 (1993–1994 Reg. Sess).) Thus, the phrase "commercial consideration" is what elevates the same criminal conduct from a wobbler to a felony punishable by a prison term of two, three, or six years under section 311.2, subdivision (b).  If commercial consideration is understood to signify an intent to trade or induce others to trade, there would be no meaningful distinction between a misdemeanant who exchanges obscene matter and a felon who exchanges the same obscene matter but does so with the intent to trade in this matter.  To give independent effect to these statutory provisions, commercial consideration must mean something other than merely intending to trade in pornographic material.[3]

### ii. *Payment Associated with a Commercial or Profitmaking Venture*

The phrase "commercial consideration" is not defined anywhere in the statute.[4]  Normally we give the words of a statute their plain and

---

obscene material" showing minors performing or simulating sex acts "shall be punished either by imprisonment in the county jail for up to one year . . . or by imprisonment in the state prison" or by a fine not exceeding "one thousand dollars ($1,000) . . . or . . . ten thousand dollars ($10,000)."

[3] Subdivision (c) of section 311.2 also punishes the distribution, exhibition, or exchange of matter that depicts a minor performing or simulating sex acts as a misdemeanor offense.  Subdivision (c) provides that "[i]t is not necessary to prove commercial consideration or that the matter is obscene in order to establish a violation of this subdivision."  If a defendant distributed obscene matter in violation of this subdivision, the conduct proscribed would also be indistinguishable from a violation of subdivision (b) under the Attorney General's reading of the statute.

[4] Section 311 defines various terms used in these obscenity statutes. For example, "distribute" means to "transfer possession of, whether with or without consideration" and "knowingly" is defined in statute as "being aware of the character of the matter or live conduct."  (§ 311, subds. (d), (e).)  The word "consideration" is not itself defined.

commonsense meaning unless a contrary legislative intent appears. (*People v. Valladoli* (1996) 13 Cal.4th 590, 597.) However, "when a word used in a statute has a well-established *legal* meaning, it will be given that meaning in construing the statute." (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19.)

Appellant contends that the word "consideration" should be construed in its legal sense as "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promise." (Black's Law Dict. (11th ed. 2019) p. 382, col. 2.) It is true that consideration has a well settled legal meaning under contract law as "a benefit conferred or agreed to be conferred upon the promisor or prejudice suffered or agreed to be suffered 'as an inducement' to the promisor." (*Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1102, citing Civ. Code, § 1605.) "To constitute consideration, a performance or return promise must be bargained for." (*Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238, 1249; see *ibid.* [" 'In the typical bargain, the consideration and the promise bear a reciprocal relation of motive or inducement: the consideration induces the making of the promise and the promise induces the furnishing of the consideration' " quoting Rest.2d Contracts, § 71, com. b].) " 'Put another way, the benefit or prejudice must have induced the promisor's promise.' " (*Property California SCJLW One Corp. v. Leamy* (2018) 25 Cal.App.5th 1155, 1165.)

There is no indication that the Legislature intended to import the legal definition of "consideration" into a criminal statute addressing the exploitation of minors in the production and distribution of child pornography. As the Attorney General points out, the law of contracts presupposes "[a] lawful object." (Civ. Code § 1550, subd. 3; see *id.*, § 1667, subd. 1 [an unlawful contract is "[c]ontrary to an express provision of law"].) The consideration of a contract must itself be lawful. (*Id.*, § 1607.) It would

10

be incongruent for the Legislature to apply contract principles to a criminal provision where the object of the agreement and the consideration used to achieve it are both unlawful and preclude the formation of a contract.

Furthermore, section 311.2 is part of a broader statutory scheme "aimed at extinguishing the market for sexually explicit materials featuring children." (*People v. Cantrell* (1992) 7 Cal.App.4th 523, 540.)  It was adopted in its present form, along with section 311.4, as a " 'double-barreled legislative attack which treats producers [of child pornography] as child abusers whether or not the material is obscene, and deals with distributors and retailers of obscene "materials depicting minors under [F]irst [A]mendment analysis.' " (*People v. Cochran* (2002) 28 Cal.4th 396, 402 (*Cochran*).)  As the Legislature declared when enacting this urgency legislation: "The proliferation of child pornography and the use of minors as subjects in child pornography pose a serious threat to the health and welfare of a large number of minors in California which necessitates immediate redress." (Stats. 1977, ch. 1061, § 4, p. 3203.)

The Legislature's purpose in seeking to eradicate the market for child pornography would not be served by limiting the reach of section 311.2, subdivision (b) to the distribution of obscene matter that is, as appellant contends, "induced or caused by promises made by the parties involved and resulting from a bargaining process."  Commercial distributors of child pornography do not necessarily engage in quid pro quo agreements with their customers.  For example, a website operator who exhibits child pornography free of charge and yet earns a profit through the Internet traffic generated on the website would not be a commercial distributor under appellant's construction of the statute.  Even though the website operator is distributing or exhibiting child pornography as a commercial or profit-making enterprise,

11

the website operator would avoid the enhanced punishment under section 311.2, subdivision (b) because the distribution was not the result of a bargained-for exchange between two parties. We cannot conclude that the Legislature intended to exclude such quintessential commercial activity from the reach of this criminal statute.

The Attorney General contends that we should adopt a more commonly understood definition of consideration as "recompense, payment" (Webster's 10th New Collegiate Dict. (1999) p. 246), or as "that which motivates a person to do something, esp. to engage in a legal act." (Black's Law Dict. (11th ed. 2019) p. 382.) Under these definitions, he argues, commercial consideration "encompasses the trading of child pornography over the Internet, where the defendant's motivation in sharing the child pornography is to obtain other pornography in return." We agree that a more commonplace definition of consideration as recompense or payment better aligns with the legislative intent underlying section 311.2, subdivision (b). But the Attorney General's proposed definition is incomplete because consideration is itself modified by the word "commercial."

"Commercial" is "generally associated with a profitmaking enterprise" (*People v. Tatman* (1993) 20 Cal.App.4th 1, 13), or "pertaining to, or engaged in commerce." (*Cochran, supra*, 28 Cal.4th at p. 404.) In First Amendment caselaw, a commercial speaker is "someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the intended audience is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers." (*Kasky v. Nike,*

12

*Inc.* (2002) 27 Cal.4th 939, 960 (*Kasky*).) Commercial speech is "speech which does 'no more than propose a commercial transaction' " (*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976) 425 U.S. 748, 762), and is generally associated with a profit motive. (See *Kasky, supra,* 27 Cal.4th at p. 962 ["commercial speech, being motivated by the desire for economic profit, is less likely than noncommercial speech to be chilled by proper regulation."], citing *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra*, 425 U.S. at p. 772, fn. 24.)

Accordingly, even if consideration signifies recompense or payment, such payment must be "commercial" in nature, meaning payment associated with a commercial transaction such as the buying or selling of goods or services or a transaction motivated by economic profit. Read in context, "commercial consideration" cannot reasonably be interpreted to extend to the simple act of trading obscene material with others, because such exchange does not necessarily involve engaging in commerce or a profitmaking enterprise. Trading in illicit material, even if unlawful, can be a noncommercial endeavor. While the Attorney General emphasizes that the child pornography here was traded over the Internet, we fail to see how using this platform to disseminate obscene matter automatically makes it commercial. And, as discussed above, equating commercial consideration with an intent to trade would erase any distinction between the wobbler and felony obscenity laws described above.

To harmonize the various statutes governing the criminal distribution of child pornography and best effectuate the Legislature's intent, we conclude that the element of commercial consideration in section 311.2, subdivision (b) requires proof that the defendant received or intended to receive payment at the time he or she distributed, exhibited or exchanged obscene matter

involving minors performing or simulating sex acts. While such payment need not be monetary, the defendant must be engaged in a commercial or profitmaking enterprise at the time the unlawful distribution occurred.

In instructing the jury on section 311.2, subdivision (b), the trial court relied on the Supreme Court's interpretation of the phrase "commercial purposes" found in section 311.4, subdivision (b), a statute that criminalizes the use of children to produce pornographic images. Given the dearth of authority concerning section 311.2, the trial court's reliance on *People v. Cochran*, *supra*, 28 Cal.4th 396, was understandable. As we explain, however, "commercial purposes" and "commercial consideration" are not interchangeable phrases and the reasons anchoring the Supreme Court's construction of section 311.4 do not carry over to a workable interpretation of section 311.2.

### *iii.* **People v. Cochran**

In *Cochran*, the defendant admitted to videotaping himself engaged in sexual conduct with his nine-year-old daughter and posting pornographic photos of his daughter in online newsgroup forums. (See *Cochran*, *supra*, 28 Cal.4th at pp. 399–400.) After a bench trial, the defendant was convicted and sentenced under several felony counts, including section 311.4, subdivision (b). (*Cochran*, at p. 400.) "The Court of Appeal reversed defendant's conviction for violating section 311.4, subdivision (b), after concluding his conduct was insufficient to support the conviction for employing a minor to produce pornography for 'commercial purposes' under the statute. The dissent would have affirmed the conviction, concluding that the statute intended to punish pornographers who intend to trade the material on a widespread basis, which includes trading over the Internet." (*Ibid.*) The Supreme Court granted review to determine the meaning of section 311.4,

14

subdivision (b). (*Cochran,* at pp. 398–399.)

The Court of Appeal majority concluded that the phrase "commercial purposes" under section 311.4, subdivision (b) was " 'generally associated with a profitmaking enterprise,' " and found no evidence the defendant intended to make a profit from the pornographic photographs he had posted on the Internet. (*Cochran*, *supra*, 28 Cal.4th at p. 402.) The Supreme Court reversed, finding that the Court of Appeal had taken too narrow a view of the statute. The relevant inquiry was not whether the defendant intended to profit financially from the distribution of photographs on the Internet, but whether he had *produced* sexual images of the minor knowing that the images would be traded or marketed commercially in the future. (*Id.* at pp. 402–403.)

"As the Court of Appeal dissent explains, section 311.4, subdivision (b), makes it a crime to persuade, induce, or permit a child to pose for commercial pornography. The statute does not govern the actual sale or distribution of child pornography, as that conduct is governed by section 311.2, subdivision (b), which makes it a felony to commercially distribute obscene material containing sexual conduct performed by a child." (*Cochran*, *supra*, 28 Cal.4th at p. 403.) Section 311.4, subdivision (b), on the other hand, governs the production of child pornography and "requires the court to look at the producer's intent when he persuaded the child to create an image of sexual conduct," not when that image is later disseminated or marketed. (*Cochran*, at p. 403.)

The Supreme Court concluded that the phrase "commercial purposes" in section 311.4, subdivision (b) does not require the People to prove that the defendant intended to profit financially from the distribution of the pornographic images. (*Cochran*, *supra*, 28 Cal.4th at p. 403.) The defendant

15

need only "inten[d] to trade it to the public at the time he is making the pornographic product." (*Id.* at p. 405.) An intent to commercialize a pornographic image can be shown by the planning and effort made to enhance the quality of the video or image to attract broader attention to the pornographic matter, as well as by the act of posting still images from the video on the Internet. (*Ibid.*)

The *Cochran* court explained that a reading of the statute "that does not require the defendant to act for financial profit is consistent with the Legislature's deliberate imposition of lengthier sentences on those who participate in creating commercial images as opposed to those who use the images for personal purposes only." (*Cochran, supra*, 28 Cal.4th at p. 403.) "The harm a child suffers increases if the record of her sexual abuse is widely disseminated and traded rather than used solely for the producer's sexual gratification," and therefore "it is the image's commercialization . . . rather than the defendant's personal profit that creates the risk of increased harm to the victim and justifies the increased penalty." (*Id.* at p. 404.) Thus, "a rational trier of fact could have found that once defendant knowingly caused his daughter to participate in the production of the pornography for Internet trading, he violated section 311.4, subdivision (b)." (*Id.* at pp. 406–407.)

The Supreme Court's interpretation of "commercial purposes" was specific to the statutory language and legislative purpose underlying section 311.4, subdivision (b). *Cochran* does not offer a workable guidepost for understanding section 311.2, subdivision (b), for several reasons.

*First*, the two statutes serve distinct, if related, ends. "Because section 311.2, subdivision (b) governs pornography distribution, it is subject to rigorous First Amendment scrutiny, which it satisfies by including an obscenity element." (*Cochran, supra*, 28 Cal.4th at p. 403.) Conversely,

16

section 311.4, subdivision (b) seeks to reach "producers, who directly exploit the child physically to create a pornographic product" and "treats producers as child abusers whether or not the material is obscene." (*Cochran,* at p. 403.) To reach producers of child pornography, including parents or guardians who allow their children to be exploited for commercial ends, the Supreme Court found that a profitmaking motive was unnecessary so long as the defendant intended to create an image for commercial trading purposes rather than for personal gratification. (*Id.* at p. 406.) The same logic does not apply when the object of section 311.2 is itself the commercial distributors and retailers of child pornography.

*Second*, it is notable that the Legislature enacted section 311.2, subdivision (b) and section 311.4, subdivision (b) concurrently as urgency legislation, yet utilized different statutory phrases to describe an important element for each felony offense. (Stats. 1977, ch. 1061, § 4, p. 3203 [amending section 311.2, subdivision (b) as urgency legislation]; ch. 1148, § 3, p. 3688 [amending section 311.4, subdivision (b) as urgency legislation].) "When the Legislature uses different words as part of the same statutory scheme, those words are presumed to have different meanings." (*Romano v. Mercury Ins. Co.* (2005) 128 Cal.App.4th 1333, 1343; see also *Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 ["Ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning."].) The *Cochran* court relied on a dictionary definition of "purpose"—as " 'something set up as an object or end to be obtained: Intention' "—to support its conclusion that a court must focus on the intent of the defendant at the time

the pornographic image is created, not when it is disseminated. (*Cochran*, *supra*, 28 Cal.4th at p. 404.)

Here, in contrast, "consideration" has a common dictionary definition that means "payment [or] recompense" (Webster's 10th New Collegiate Dict. (1999) p. 246). Unlike the producers of child pornography, section 311.2, subdivision (b) requires that we look to a distributor's intent at the time the obscene matter is distributed, exhibited, or exchanged for commercial consideration. As discussed above, a practical understanding of the phrase "commercial consideration" is that the defendant was engaged in a commercial or profitmaking enterprise when he or she received recompense for the dissemination of obscene matter involving sexual conduct by minors.

*Finally*, for the reasons discussed at length, an interpretation of commercial consideration that signifies an intent to trade obscene material with others would render words and phrases in section 311.2, subdivision (b) superfluous to one another, and make the conduct criminalized in this felony provision indistinguishable from the conduct proscribed in the wobbler statute, section 311.1, subdivision (a). We must give independent meaning and effect to the various words and statutes that govern the criminal act of distributing obscene matter showing sexual conduct by children.

## B.     Instructional Error

Having concluded that the element of commercial consideration cannot simply mean an intent to trade or induce others to trade in pornographic material over the Internet, we must determine whether the trial court's jury instruction of section 311.2, subdivision (b) amounted to reversible error.[5]

---

[5] Defense counsel did not object to the jury instructions at trial. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'

18

### i. Additional Background

The prosecution's case under section 311.2, subdivision (b) rested on the theory that the People were not required to prove that appellant intended to profit financially from the distribution of child pornography. Rather, as the prosecutor argued to the jury, "[i]t is sufficient to prove that appellant intended to trade the [obscene] matter. I take some, you take some. [¶] Isn't that the very definition of peer-to-peer?"

The trial court's jury instruction hewed closely to the prosecution's theory. Under CALCRIM 1141-A, the jury was instructed that to find appellant guilty of section 311.2, subdivision (b), "the People must prove that: [¶] 1. The defendant distributed or exchanged obscene matter with someone else; [¶] 2. When the defendant acted, he knew the character of the matter; [¶] 3. When the defendant acted, he knew that the matter showed a person under the age of 18 years who was personally participating in or simulating sexual conduct; AND [¶] 4. When the defendant acted, he intended to distribute, show, or exchange the matter to someone else for money or other commercial benefit."[6] The trial court modified the fourth element with the following instruction: "*Commercial benefit* does not require proof that the defendant intended to profit financially from distribution of obscene matter.

---

[Citation.] But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1112.) That is the situation here.

[6] CALCRIM No. 1141 is a pattern instruction that defines the elements of distributing obscene matter showing sexual conduct by a minor under sections 311.1, subdivision (a) and 311.2, subdivision (b). For reasons that are unclear, the statutory phrase "commercial consideration" does not appear in the instruction. The Bench Notes direct trial courts to "[g]ive the bracketed phrase "for money or other *commercial benefit* in element 4 if the defendant is charged under Penal Code section 311.2(b)." (Italics added.)

*Commercial benefit* includes the trade of obscene matter through the internet."[7]

The trial court also instructed the jury on the lesser included offense of distributing obscene matter showing sexual conduct by a minor without the element of commercial consideration. (§ 311.1, subd. (a).) The CALCRIM 1141-B instruction shared the elements of CALCRIM 1141-A with the exception of element four, which read: "When the defendant acted, he intended to distribute or exchange the matter to someone else." The trial court added: "Please refer to CALCRIM 1141-A for the remaining portion of this instruction, excluding any reference to "commercial purpose" or commercial benefit." The jury was instructed to consider both the greater charged offense under section 311.2, subdivision (b), and the uncharged lesser included offense under section 311.2, subdivision (c).

During deliberations, the jury asked the trial court to "explain the distinction between commercial and non-commercial in the context of the internet and file sharing[.]" The trial court responded: "The dissemination of obscene matter, as defined, on the internet with the intent to trade or induce others to trade the pornographic material is a 'commercial purpose.' To disseminate such material on the internet without such intent to trade or induce others to trade is 'non commercial.' " The court also provided an excerpt citing and describing in part the Supreme Court's opinion in *Cochran*, *supra*, 28 Cal.4th 396.

---

[7] The People had proposed a special instruction defining the phrase "commercial consideration" as follows: " 'commercial consideration' does not require proof that the defendant intended to profit financially from distribution of pornographic images, only that he intended to trade the pornography at some point in the future. *People v. Cochran* (2002) 28 Cal.4th 396."

Consistent with the People's theory of the case, no evidence was presented at trial that appellant was motivated to earn a profit or was engaged in a commercial enterprise when he shared obscene matter over a peer-to-peer network.  However, substantial evidence was adduced that appellant distributed child pornography when he knowingly allowed obscene images and videos of minors to be available for download to others through a peer-to-peer sharing network over the Internet.

## ii.   *The Jury Was Erroneously Instructed*

We conclude that the trial court misstated the law when it instructed the jury on the fourth element of section 311.2, subdivision (b).  Element four of CALCRIM-1141-A stated: "When the defendant acted, he intended to distribute, show, or exchange the matter to someone else for money or other commercial benefit."  The trial court equated "commercial benefit" with "the trade of obscene matter through the internet" and later responded to a jury question by stating: "The dissemination of obscene matter, as defined, on the internet *with the intent to trade or induce others to trade* the pornographic material *is a 'commercial purpose.'*  To disseminate such material on the internet without such intent to trade or induce others to trade is 'non commercial.'" (Italics added.)

The court's instructions to the jury made clear that the element of commercial consideration required nothing more than an intent to trade or induce others to trade in obscene matter over the Internet.  As we have explained, that is an erroneous construction of section 311.2, subdivision (b).  Commercial consideration requires proof that when the defendant disseminated the obscene matter, he intended to receive money or some other form of recompense as part of a commercial or profitmaking venture.

Ordinarily, we review instructional errors under the reasonable probability standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Flood* (1998) 18 Cal.4th 470, 490.) Under *Watson*, "prejudicial error exists where it is ' "reasonably probable" ' that a result more favorable to the appealing party would have been reached in the absence of error." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 360.) However, "[j]ury instructions that relieve 'the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution,' and must be assessed under *Chapman* [*v. California* (1967) 386 U.S. 18, 24]." (*Id.* at p. 359.)

Appellant contends that the trial court's error violated his constitutional right to due process and a fair trial, necessitating review under the *Chapman* beyond-a-reasonable-doubt standard. We need not resolve this question because we conclude that appellant was prejudiced even under the more deferential *Watson* standard of review. When assessing prejudice under the *Watson* standard, we "focus[ ] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done" and we "consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) "A reasonable probability in this context does not mean more likely than not; it means a reasonable chance and not merely a theoretical or abstract possibility." (*People v. Woods* (2015) 241 Cal.App.4th 461, 474.)

There is a reasonable likelihood that the jury would not have convicted appellant under section 311.2, subdivision (b) had it been properly instructed

on the element of commercial consideration. The jury was instructed that merely intending to trade in pornographic matter over the Internet satisfied this element of the offense. The prosecution reinforced this misstatement of law when it argued in closing that the People were not required to prove that the defendant intended to profit financially from the distribution and that "[i]t is sufficient that he intended to trade the [obscene] matter. I take some, you take some. [¶] Isn't that the very definition of peer-to-peer?" The jury was plainly focused on this question during deliberations, as reflected in its note asking the court to clarify the distinction between commercial and noncommercial distribution of obscene matter over a peer-to-peer network. Finally, there was little to no evidence that appellant was motivated to earn a profit or was engaged in a commercial venture at the time he distributed or exchanged the obscene matter over the Internet.

Accordingly, we conclude that the trial court's erroneous jury instruction regarding the element of commercial consideration under section 311.2, subdivision (b) was prejudicial.

### iii. Remand

For the reasons explained above, appellant's convictions under section 311.2, subdivision (b) cannot stand because of the instructional error. It does not necessarily follow, however, that the judgment must be unconditionally reversed. Appellant does not dispute that sufficient evidence supports his conviction for distribution of child pornography without commercial consideration. (§ 311.1, subdivision (a).) The record establishes that appellant distributed child pornography when he knowingly allowed others to access and download files containing obscene images and videos of minors performing sex acts on a shared folder through a peer-to-peer sharing network. Under such circumstances, the prosecution has the option to retry

23

appellant or to accept modification of the judgment to reflect a conviction for the lesser included offense. (*People v. Kelly* (1992) 1 Cal.4th 495, 528 ["When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense."].)

While appellant does not dispute that the evidence is sufficient to support a conviction under section 311.1, subdivision (a), he contends that the evidence does not support *four* convictions of distributing obscene matter without commercial consideration. Appellant was charged with four counts of distribution based on Sergeant Servat's downloads on April 18, 2017 and May 26, 27, and 28, 2017. He argues that counts two, three, and four arising from the three downloads in May are multiplicitous because these downloads were based on the same torrent file. In appellant's view, "[i]t was [his] conduct in making the file available for download" in the first instance "and not the actual downloading of the file by the officer that constituted [his] criminal act." Appellant thus asserts he committed at most two counts of distribution because he made only two torrent files containing child pornography available for download. We disagree.

As noted above, the word "distribute" is defined in the obscenity statutes as "transfer possession of . . . ." (§ 311, subd. (d).) "Transfer," a term not defined in the statute, means "[t]o convey or remove from one place or one person to another." (Black's Law Dict. (11th ed. 2019) p. 1803, col. 2; Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 1328 [defining "transfer" as "to convey from one person, place, or situation to another: Move, Shift"].) Similarly, "download" means "to transfer (as data or files) from a usu[ally] large computer to the memory of another device (as a smaller computer)." (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 376.)

Because "distribute" necessarily involves the transfer of materials to another person or location, a distribution within the meaning of the obscenity statutes occurs when a defendant's child pornography materials are actually transferred to or downloaded by another person.

Although appellant concedes that "the downloading of a torrent file containing multiple pornographic images and videos by [Sergeant] Servat's program would complete an act of distribution," he nonetheless argues that counts two through four are "legally unauthorized" because Servat downloaded the "same file with the same contents." Appellant's arguments are belied by the record.

Sergeant Servat's testimony established that downloading the same torrent file does not necessarily mean that the same files with the same content are downloaded. He testified that on May 26, 2017, a torrent file was downloaded with approximately 244 pornographic files, stored in subfolders bearing names such as "Hawaiian Breeze" and "LS Studio." The same torrent file was downloaded the next day, also resulting in 244 files, but Servat testified that there were "one or two" more folders in the May 27 download. The May 27 download contained a folder named "Spoilt bab" and a subfolder named "Issue 15, Spoilt Babies." According to Sergeant Servat, the download on May 27 contained "mostly" pornographic images, but also a 50-minute video depicting 9 and 10 year old girls orally copulating and digitally penetrating each other. On May 28, the same torrent file was downloaded again, this time resulting in 217 obscene files. The May 28 torrent download included a folder named "Happy Birthday" with a subfolder containing 12 obscene videos showing 7 and 8 year old girls in sexually provocative acts.

Appellant complains that Sergeant Servat did not specify any differences in the folders or whether the folders contained different files, but

such testimony was not necessary for the jury to draw the conclusion that each day of downloading resulted in the distribution of distinct pornographic content. Appellant does not identify any evidence in the record that supports his assertion that downloading the same torrent file necessarily results in the same shared content. On the contrary, given Sergeant Servat's testimony about the differing number of files or folders downloaded from the same torrent file on separate days, his description of the various folder and subfolder names and contents, and his testimony concerning the different obscene videos and images of minors found on particular days, the jury reasonably could have found that the pornographic material distributed on May 26, 27, and 28 was not the same, even if there was some overlap in the content. Accordingly, the evidence was sufficient to support the jury's finding that each count against appellant was based on separate acts of distributing distinct obscene matter.

Appellant's reliance on section 954 is therefore misplaced. While section 954 authorizes convictions for multiple offenses based on the same criminal act, it does not permit " 'multiple convictions for a different statement of the same offense when it is based on the same act or course of conduct.' " (*People v. Vidana* (2016) 1 Cal.5th 632 (*Vidana*).) Citing *Vidana* and *People v. Coyle* (2009) 178 Cal.App.4th 209 (*Coyle*), appellant contends that is what has occurred here. However, *Vidana* and *Coyle* concerned the application of alternative legal theories to the same act or course of conduct. (See *Vidana, supra,* 1 Cal.5th at pp. 647–648 [defendant could not be convicted for the same offense based on alternate theories of theft]; *Coyle, supra,* 178 Cal.App.4th at p. 217 [defendant properly charged with three counts that "simply alleged alternative theories" of the same offense of murder of single victim but could only stand convicted of one murder].)

Where the content of the obscene matter being distributed over three days is not the same, the defendant has not committed the same criminal act three times but has instead committed separate distribution offenses. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 62 ["[A] separate conviction is permissible for each *completed* charged offense, even if the defendant had the same intent and objective in committing multiple crimes and even if the defendant committed the crimes at or near the same time"], italics added; e.g., *People v. Clair* (2011) 197 Cal.App.4th 949, 957–961 [affirming four convictions of distributing child pornography to a minor and declining to stay execution of sentences, where defendant "attached different images to each email," despite some of the emails being sent to "the same recipient more than once"].) The Attorney General relies on *People v. Haraszewski* (2012) 203 Cal.App.4th 924 (*Haraszewski*), for the proposition that even distributing the *same* pornographic files over separate days can result in multiple distribution violations. In *Haraszewski*, the defendant was convicted of multiple acts of duplication of child pornography in violation of section 311.2, subdivision (d). In rejecting the defendant's reliance on decisions concerning possession of pornographic matter, the appellate court noted that when a person creates multiple images of child pornography, each additional image further exploits the minor victim by adding to the market of illicit material. (*Id.* at p. 945, discussing *People v. Shields* (2011) 199 Cal.App.4th 323, 330–332.) We need not decide whether each distribution of the *same* pornographic content can support a separate conviction of a distribution statute because the evidence here sufficiently established that different obscene content was disseminated on different days.

This leads us to appellant's final argument that treating each download by Sergeant Servat as "a separate act of distribution would lead to absurd

results" because criminal liability would be "subject to the whims and aggressiveness of a particular police officer or the inherent randomness of the software search tool used" and would potentially allow "two defendants who engage in the identical conduct . . . [to] face different levels of criminal liability depending upon how many times a particular file was downloaded." Again, we disagree.

Declining to find that appellant committed multiple violations of distributing child pornography would run counter to the purpose of the obscenity statutes: to prevent the abuse and sexual exploitation of children and extinguish the market for child pornography. (See *Cochran*, *supra*, 28 Cal.4th at p. 402.) As the Attorney General explains, each time a file containing distinct pornographic material is downloaded both adds to the child pornography market and perpetuates the abuse of the victim. This is particularly true in the context of peer-to-peer sharing of torrent files on a protocol such as BitTorrent, which allows for the widespread dissemination of child pornography.

As Sergeant Servat testified, the technology allows users to share massive amounts of illicit data, and it incentives users to share files. Simply put, "the software . . . wouldn't work without sharing." The evidence established that appellant spent 16 hours a day on his computer, seven days a week, and actively used BitTorrent to amass child pornography. The jury was told that the BitTorrent display on a user's computer shows when a file is downloaded, and could have reasonably inferred from the evidence that appellant saw when a download of his obscene files was underway and consciously allowed it to happen. On this record, we find that each download of a torrent file which contained new or different obscene matter of minors performing or simulating sex acts was a completed distribution that supports

a separate conviction under section 311.1, subdivision (a) or section 311.2, subdivision (b).

On remand, the People will have the option to retry the four counts of distribution under section 311.2, subdivision (b) should they so choose. If the People do not elect to retry appellant, the judgment will be modified to reflect conviction under the lesser included offense of 311.1, subdivision (a).

## III.   DISPOSITION

The judgment is affirmed with respect to the conviction of possession of child pornography and its special allegation (§ 311.11), but it is reversed with respect to the convictions under section 311.2, subdivision (b), with directions as follows:  If the People do not bring appellant to trial within 60 days after the filing of the remittitur in the trial court pursuant to Penal Code section 1382, subdivision 2, the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction in counts one through four of distribution of child pornography without commercial consideration (§ 311.1, subdivision (a)), and shall resentence appellant accordingly.  (See *People v. Kelly, supra*, 1 Cal.4th at p. 528.)

_____
Sanchez, J.

WE CONCUR:


_____
Humes, P. J.


_____
Banke, J.


A156114

People v. Wimer (A156114)

Trial Court:        San Mateo Superior Court


Trial Judge:        Hon. Lisa A. Novak


Attorneys:

David L. Polsky, under appointment from the First District Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Seth K. Schalit, Supervising Deputy Attorney General, Katie L. Stowe, Deputy Attorney General, for Plaintiff and Respondent.